IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:02CV211-03-MU

JELANI SIMBA,                          )
                                       )
            Plaintiff,                 )
                                       )
    v.                                 )          **O R D E R**
                                       )
DEAN WALKER, et al.,                   )
                                       )
            Defendants.                )
_____)

      **THIS MATTER** comes before the Court upon Petitioner's Complaint pursuant to 42 U.S.C.

§ 1983 (Document No. 1); Plaintiff's Amended Complaint (Document No. 2); Plaintiff's Second

Amended Complaint[1] [2] (Document No. 8); Defendant Haque's Answer and Motion to Dismiss

(Document Nos. 143, 144); Plaintiff's Response to Defendant Haque's Motion to Dismiss

(Document No. 161); Defendant Lightsey, De Vaul and Williams' Motion for Summary Judgment

(Document No. 199); Defendants' (hereinafter referred to as DOC Defendants[3] [4]) Motion for

---

      [1] For the first time in his Response to Defendants' Motion for Summary Judgment, Plaintiff raises new claims concerning alleged ETS exposure at Piedmont and Scotland Correctional Institutions.  However, Plaintiff did not include these claims in his Complaint, Amended Complaint or his SAC.  Therefore, the Court will not consider these news claims.

      [2] Also for the first time in his Response to Defendants' Motion for Summary Judgment, Plaintiff alleges that he has a "history of recurrent anaphylactic reactions," (Pl's Resp. at 122), and "anaphylactic reactions to ambient (secondhand) smoke," (id. at 128 n.62).  Plaintiff did not mention his "anaphylactic reactions" in his Complaint, Amended Complaint or in his SAC.  The Court will not consider Plaintiff's new claim that he suffered from anaphylactic reactions to secondhand smoke.  Furthermore, Plaintiff's medical record does not support a claim that he experienced anaphylactic reactions to secondhand smoke.

      [3] On September 15, 2003, this Court stayed this action as to Defendants Charles Hassell, Cynthia Moore and Larry Williams pursuant to the Soldiers' and Sailors' Civil Relief Act

Summary Judgment (Document No. 204); Plaintiff's Response to Defendants' Motion for Summary Judgment (Document No. 229); Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment (Document No. 232) and Plaintiff's Supplemental Response to Defendants' Motion for Summary Judgment (Document No. 233.)

## I. PRIOR LITIGATION

Plaintiff has filed at least two other lawsuits asserting claims related to Environment Tobacco Smoke ("ETS"). In the United States District Court for the Eastern District of North Carolina, Plaintiff filed Simba v. Hunt, No. 5:98CT-691. This lawsuit asserted damages arising out of alleged exposure to ETS while incarcerated at Pamlico Correctional Institution from June 31, 1997 through October of 1998. The Magistrate Judge has recommended, in his Memorandum and Recommendation, dismissing plaintiff's suit on the basis that there was no medical finding that the plaintiff was allergic to cigarette smoke or that his health was being detrimentally affected by exposure to ETS. This case is still pending.

Plaintiff also alleged health problems caused by ETS exposure in his second lawsuit filed in the United States District Court for the Eastern District of North Carolina entitled Simba v. Thompson, 5:99-CT-433. In that opinion, the Court adopted the Magistrate's Memorandum and Recommendation and dismissed the plaintiff's claims related to his alleged ETS exposure at Pamlico

(Document No. 99.) The Court now lifts the stay as to those Defendants, however, because the Court is granting DOC Defendants' Summary Judgment Motion and dismissing the entire case, there is no need to locate and serve these Defendants so that they can file an Answer. The case is dismissed as to these Defendants as well.

[4] Plaintiff voluntarily dismissed Defendants Spence and Colon on September 15, 2003 (Document No. 98.) Defendants Anderson, Beam, Vhurch, Ellington, Lail, Lamb, Maddox, Pierson and Presnell were successful in their Motion to Dismiss, which was granted on September 17, 2003 (Document No. 116.)

Correctional Institution from October 1998 to September 1999. The Court noted the plaintiff's failure to demonstrate the actual seriousness of injury as a result of ETS exposure and that he was exposed to unreasonably high levels of ETS. Plaintiff appealed that decision to the Fourth Circuit Court of Appeals and the Court of Appeals affirmed. Plaintiff then filed a petition for writ of certiorari in the Supreme Court which was denied.

## II. FACTUAL BACKGROUND

The instant lawsuit picks up where Plaintiff's last two lawsuits left off. Plaintiff while housed at Lumberton Correctional Institution in North Carolina serving a life sentence, filed this 1983 action against more than 100 defendants alleging that he has suffered due to his exposure and chronic aversion to ETS while confined at seven different North Carolina correctional facilities beginning in October 1999 and continuing through August 2002. All of the Defendants are employees, administrators, or in some way connected to the operation of the institutions in which Plaintiff was housed during this time period.[5] Plaintiff claims that he was subjected to unconstitutional levels of ETS in each of the institutions involved in this action, and that Defendants at each institution were deliberately indifferent to his serious medical condition or a possible risk of

---

[5] Plaintiff also named Christopher Brenner, an inmate in the North Carolina state prisoner, as a Defendant to this action. First, by Order dated September 15, 2003 this Court explained that the US Marshall had made reasonable attempts to serve this Defendant but was not successful. As such, the Court directed the Plaintiff to either provide the Court with more information so that the Marshall could effectuate service or effectuate service himself in compliance with Rule 4 of the Federal Rules of Civil Procedure (Document No. 99.) On March 31, 2004, the US Marshall filed a return of service unexecuted for Christopher Brenner. Therefore, it appears, Mr. Brenner was never served in this case. Next, even if Defendant Brenner was properly served, the Court notes that he is/was an inmate at a North Carolina Correctional facility. To be sure, an inmate is not a state actor under § 1983 and therefore not a proper party to a § 1983 suit. Therefore, to the extent that inmate Brenner is even before this Court, he is dismissed.

serious future harm. Plaintiff also claims that some Defendants conspired to have him attacked by another inmate and some Defendants retaliated against him by filing false disciplinary charges because he complained about second hand smoke.

By way of relief, Plaintiff has requested injunctions (I) proscribing further retaliation against him; (ii) preventing Defendants from divesting themselves of real properties for purposes of defeating monetary judgments of this Court; and (iii) directing Defendants to provide Plaintiff with appropriate housing in the general population with necessary medical attention to address his current aversion to ETS and the risk of future adverse effects to his health. Plaintiff has also requested monetary damages, including punitive damages, in excess of $4 million.

### 1. Craven Correctional Institution

After Plaintiff's September 14, 1999 transfer to this facility, he was housed in a single cell. On September 21, 1999 Defendant McRavin attempted to move Plaintiff from a single cell to an open dormitory. Plaintiff explained that he was housed in a single cell because of smoking issues, however Defendant McRavin kept Plaintiff locked in a cage for several hours until ordered to release him.

Defendant McRavin specifically denies placing Plaintiff in a cage (McRavin Aff. ¶ 6), and points out that Plaintiff did not file a grievance regarding Defendant McRavin's action and therefore did not exhaust his administrative remedies with regard to this claim.

### 2. Franklin Correctional Institution

From Craven Correctional Institution, Plaintiff was transferred to Franklin Correctional Institution (FCI) on October 1, 1999. Upon arrival, he "immediately informed the medical and security staff of [his] aversion to smoking," and showed them his sinus medications and medical

records.  Nevertheless, Plaintiff was temporarily housed in a smoking dorm (B Dorm) for an unspecified period before being moved to the non-smoking dorm (A Dorm).  The smoke free dorm was separated from a smoking area by a hallway.  The control area, which included the hallway, was a designated smoking area.  Nothing prevented the flow of smoke into the A Dorm and free standing fans at the front of the dorm blew smoke directly into A Dorm.  Further, an exhaust fan at the back of A Dorm drew smoke into the dormitory from the control area and B Dorm.

On November 4, 1999 Plaintiff alleges that he received a Form DC-490 Medical Notification Slip for smoke-free housing from Nurse Boone.  Plaintiff describes one occurrence at Franklin in greater detail than the others.  During the period when Franklin still had authorized smoking areas, Defendant Best was on duty and sitting behind the control desk smoking a cigar. Plaintiff asked Defendant Best to stop smoking, showing him the medical notification slip from Nurse Boone.  Defendant Best replied that "he would try not to light the cigar so much," but commented that he was keeping within the authorized smoking zone. (Pl.'s Compl, ¶ 5.)

During Plaintiff's stay at Franklin, the institution became smoke-free, but Plaintiff claims the prison guards still smoked at their stations.  In one instance, Plaintiff apprised Defendants Spruill, Baucom, and Snyder of this change in policy, and Spruill replied that he would smoke as long as his employer let him.  They then blew smoke into the fans, which drew the smoke into A-dorm.

During his time at Franklin, Plaintiff submitted grievances complaining of the levels of ETS, and requested smoke-free housing.  Officials first responded that "as of 10-04-99 smoking will not be allowed inside the units, only on the yard."  However, guards were still allowed to

smoke in designated areas. To Plaintiff's grievance concerning the incident with Defendant Best, officials responded: "[The] control center in Dorm One is a designated smoking area. No one was in violation of policy for smoking in that area. When [Plaintiff] complained about smoke, staff turned on the exhaust fans to clear the smoke." (Plaintiff's exhibit 4-C).

Plaintiff also claims that many of the guards either knew of smoking in unauthorized areas and did nothing, or smoked in unauthorized areas themselves. Plaintiff made numerous sick call visits while at Franklin, and asserts that Defendant Dr. Lightsey, prison physician, erroneously determined that Plaintiff's medical problems were not connected to ETS, and did so in a condescending manner. Plaintiff claims that the guards smoking, allowing others to smoke, and a general failure to respond adequately to Plaintiff's grievances constituted deliberate indifference to his serious medical needs.

DOC Defendants contend that during his stay at Franklin, Plaintiff submitted approximately fifteen grievances complaining about a variety of things including: the arrangement of beds in his dormitory, late delivery of holiday packages, preferential treatment of white inmates, deprivation of a flyswatter, mail procedures and medical care. On more than one occasion, Plaintiff's grievance was rejected for the policy reason that he already had another grievance pending. (Townes Affidavit ¶ 12.) On April 14, 2000 Plaintiff submitted grievance 4215-00-0283 complaining about ETS. Specifically, Plaintiff complained that the dormitory duty officer (Officer Best) was smoking a cigar that aggravated his sinus condition.[6] Three

_____

[6] The step one response stated that the duty officer was smoking in the control center, a designated smoking area. When Plaintiff complained, Defendant Barbee turned on an exhaust fan to clear the smoke. Defendant Townes was satisfied that staff took appropriate action to resolve Plaintiff's complaint.

months later, on July 14, 2000, Plaintiff attempted to submit another grievance complaining about ETS.  In that grievance, Plaintiff complained that the officer on duty was sitting behind the fan smoking a cigar.  The grievance was delayed because Plaintiff had submitted another grievance that had not yet completed the step two administrative level.  Plaintiff did not resubmit this grievance or submit any other grievances complaining about ETS (Townes Affidavit ¶ 12.)

Franklin had a facility-wide smoking policy in effect during Plaintiff's incarceration. (Maness Affidavit ¶ 7and Exhibit A; Townes Affidavit ¶¶ 7,9.)  The policy provided that smoking was permitted only in authorized areas and prohibited in sleeping areas, bathrooms and segregation facilities.  Plaintiff's initial housing was Dorm 4 M Block, where smoking was prohibited in the day room, bathrooms and sleeping areas.  Smoking was permitted in the day rooms of Dorms 4 L and N, but exhaust fans located in the day rooms provided ventilation and pulled air out of the cell block.  The facility-wide smoking policy allowed staff to smoke in control centers and individual staff offices.  (Id. ¶ 8.)

On October 15, 1999 Plaintiff was moved to Dorm 1 A Block, where smoking was prohibited in the day room, bathroom and sleeping area.  Smoking was permitted in the Dorm 1 B day room and by staff in the control center.  The Dorm 1B day room is located in the back of the dormitory.  Stand alone fans circulated air, and the dormitory had an exhaust fan.  During Plaintiff's incarceration at Franklin, maintenance records do not show malfunctions or repairs of exhaust fans or stand-alone fans.  (Id. ¶ 9.)

From May 23, 2000 to June 14, 2000 Plaintiff was assigned to segregation.  Inmates in segregation may not possess tobacco products and staff are permitted to smoke only in the control area.  For one day, June 14, 2000, Plaintiff was assigned to Dorm 1 B, where smoking

was permitted in the day room. On June 15, 2000 Plaintiff was reassigned to Dorm 1 A, where he remained until his transfer on November 16, 2000.

DOC Defendants contend that by letter dated March 29, 2000 sent to Defendant Townes, Plaintiff requested smoke-free housing. While Plaintiff stated that this was his second such request, Defendant Townes does not recall receiving a first request from Plaintiff for smoke-free housing, but her correspondence file does indicate that she received a second request. (Townes Affidavit ¶ 8.) Also on March 29, 2000 Plaintiff wrote to Defendant French, requesting smoke-free housing. On April 13, 2000 Defendant Maness responded, on behalf of Defendant French, to Plaintiff's letter. Defendant Maness wrote that smoking and nonsmoking areas were established to reduce health and safety risks that might be associated with ETS and staff were expected to enforce the existing smoking policy (Maness Affidavit, Ex, D.) DOC Defendants contend that Plaintiff did not present Defendant Maness or Defendant Townes with a DC-490 order for smoke free housing. Further, while Plaintiff was housed at Franklin, disciplinary action was taken in approximately eighty-six cases against inmates for noncompliance with the smoking policy (Townes Affidavit ¶ 9) and on April 27, 2004 Franklin became a smoke-free facility. (Id. ¶ 16.)

With respect to Plaintiff medical condition, Plaintiff's medical records show that on October 1, 1999, upon medical screening, a nurse at Franklin concluded that Plaintiff could be housed with the general population. (Smith Aff. ¶ 21; Ex. D to Smith Aff. 1285.) Plaintiff's medical records do not include a Form DC-490 Medical Notification Slip for smoke-free

housing.[7]  Nurses' notes from the period from October 1, 1999 through November 24, 1999 do not refer to any complaints by Plaintiff about ETS.  Physician's notes for the period from October 14, 1999 through December 23, 1999 do not refer to any complaints by Plaintiff about ETS. (Smith Affidavit ¶ 21.)  In early 2000, Plaintiff submitted numerous sick call requests, but did not complain about ETS (Id. ¶ 22.)  At Plaintiff's May 2, 2000 annual medical review, he self-reported that ETS caused his chronic sinusitis.  (Id. ¶ 23.)  In a sick call request dated August 29, 2000, Plaintiff complained about coughing while in bed and while sitting but did not complain about ETS (Id. ¶ 24.)  On October 10, 2000 and October 16, 2000 Plaintiff submitted sick call requests complaining about ETS, and on October 18, 2000 Plaintiff failed to appear at sick call.

Plaintiff's medical records also show that, before incarceration at Franklin, he had been diagnosed with hiatal hernia which symptoms included coughing mainly at night.  (Smith Affidavit ¶ 15.)  Prior to Plaintiff's transfer to Franklin, Plaintiff had a disagreement with Dr. Collins about wanting smoke-free housing.  Dr. Collins concluded that Plaintiff did not need such housing and was manipulating him.  (Id. ¶ 8.)  Additionally, Plaintiff's medical records reflect that prior to his transfer to Franklin, Plaintiff attributed his coughing and congestion to ETS exposure.  (Id ¶¶ 13, 18, 19.)

Dr. Lightsey treated Plaintiff from October 14, 1999 through October 17, 2000 (Lightsey

---

[7] Plaintiff included Ex. 31 in his response to Defendants' Motion for Summary Judgment which is a copy of a Form DC-490 Medical Notification Slip dated November 14, 1999 issued by M. Boone, RN.  This medical slip indicates that Plaintiff should be housed in a smokeless dormitory.  While Plaintiff's medical record maintained by the DOC did not contain a Form DC-490 for smoke-free housing, such "dispute" does not alter this Court's analysis that Plaintiff has not exhausted his claims against Franklin Defendants nor has he articulated a deliberate indifference claim.

Affidavit ¶ 14.)  Dr. Lightsey examined or treated Plaintiff on October 14, 1999,[8] November 8, 1999, December 23, 2999, January 19, 2000 and January 27, 2000.  Plaintiff did not complain of ETS problems on these dates.  Instead, Dr. Lightsey treated Plaintiff for obesity, hypertension, high blood pressure and possible vertigo.  (Lightsey Affidavit ¶¶ 5-7.)  On February 8, 2000 Dr. Lightsey examined Plaintiff due to a complaint of shortness of breath.  Dr. Lightsey ordered a chest x-ray, the results of which were normal, and ruled out acute cardiopulmonary disease.  (Id. ¶ 8.)  Dr. Lightsey also examined Plaintiff on February 17, March 23, April 11, June 1 and 13 and July 20, 2000.  Again during these medical visits, Plaintiff did not complain of ETS problems.  On August 15, 2000 Plaintiff complained of chest pain.  Dr. Lightsey ordered tests which showed normal results.  (Id.)  Dr. Lightsey treated Plaintiff on September 5[9] and 12, and October 10, 17 and 19 and Plaintiff did not complain of ETS during any of these visits.  (Id. ¶¶ 10-11.)  Plaintiff was seen on October 16, 2000 for a sick call request in which he complained of a cough exacerbated by burning wood or tobacco.  This was the first occasion that Plaintiff complained of ETS to Dr. Lightsey.  (Id. ¶ 11.)  Plaintiff was transferred out of Franklin on October 20, 2000.

### 3. Albemarle Correctional Institution

_____

[8] Dr. Lightsey first saw Plaintiff on October 14, 1999 since being transferred to Franklin Correctional Institution on September 14, 1999.  Plaintiff did not voice any complaints but merely wanted his medications continued.  Dr. Lightsey wrote an order continuing Plaintiff's prescriptsions for Ibuprofen, Lipitor and Zantac for three months.

[9] Plaintiff was seen on September 5, 2000 complaining of phlegm in his throat and recurrent abdominal pain.  Dr. Lightsey ordered a H-Pylori serum study to rule out any pulmonary problems or sinusitis.  The study results were within normal limits.  Dr. Lightsey prescribed Prevacid, Biaxin, Entex and Flagyl and discontinued Plaintiff's Zantac (Lightsey Affidavit ¶ 10.)

Plaintiff arrived at Albemarle Correctional Institution on October 20, 2000 and was housed in a small dormitory where inmates were allowed to smoke. Plaintiff suggested that he be housed in segregation, "until appropriate arrangements could be made," and the officials accommodated him. (Pl.'s Compl.¶ 19.) On November 12, 2000 Plaintiff sought assistance from Defendant Beck and received a response declining to take any action. Plaintiff remained in segregation until December 11, 2000 when Defendant Williams gave Plaintiff a direct order to return to the dormitory.

Plaintiff alleges that guards at Albemarle either pretended not to notice smoking by inmates, or were wilfully ignorant of inmates' smoking. Others actively facilitated inmates' smoking, as when Defendant Miller pulled the door closed so that an inmate could smoke without being seen. (Compl. ¶ 20.) For a period of time at Albemarle, approximately one month in total, Plaintiff was housed next to a chain smoker and two other smokers. (Compl. ¶¶ 20-22.)

Plaintiff submitted grievances and requests. In a typical response to Plaintiff's grievance, Defendants wrote: "this facility is a non-smoking Facility ... If any inmates or staff member is caught smoking in a no-smoking area, then appropriate corrective action will be taken to address and resolve the issue" (Pl.'s Ex.008.) Plaintiff discussed the unsatisfactory nature of these responses with Defendant Tucker, who simply advised Plaintiff to request a transfer. (Compl. ¶ 25.)

According to the DOC Defendants, Plaintiff submitted only two grievances while at Albermarle, both of which were designated as emergency grievances. On November 21, 2000 Plaintiff submitted grievance 4590-00-SEG-177 complaining that he was required to be housed in segregation because inmates smoked in all the dormitories (Hamlin Aff. Ex. D.) This

grievance does not specify times or locations where inmates violated the smoking policy, does not name any officers or staff to whom Plaintiff complained about smoking policy violations and does not name any officers or staff who allegedly failed or refused to enforce the smoking policy.

On November 27, 2000 Plaintiff submitted grievance 4580-00-SEG-180 which he also designated as an emergency grievance (Hamlin Aff. Ex. E.)   In this grievance, Plaintiff complained that he had not received thermal wear.  Plaintiff appealed this grievance through all levels of administrative review.

Although Plaintiff alleges that he was sent to segregation on December 11, 2000 on a fictitious charge due to his filing a grievance related to secondhand smoke, DOC Defendants contend that Plaintiff did not submit any grievance on December 11, 2000 and that Plaintiff was sent to segregation for using profane language and disobeying an order.  During the disciplinary hearing on these charges, Plaintiff plead guilty to using profane language. (Hamlin Aff.¶ 13.)

Plaintiff submitted a sick call request on November 21, 2000 complaining that he had a chronic cough and congestion for several months and that his cough was aggravated by ETS.  On November 29, 20000 Plaintiff was examined by a nurse and had no sore throat or nasal drainage. (Smith Affidavit ¶ 30.)  The nurse placed Plaintiff on the physician's list for November 30, 2000, and noted that Plaintiff needed a new order for a pillow wedge for hiatal hernia.  On December 5, 2000 Plaintiff complained that cough syrup had not stopped his chronic cough.  On December 8, 2000, Plaintiff was seen by a nurse who noted that Plaintiff's chart was reviewed by the unit physician on December 7, 2000.  It was also noted that new medication had been ordered for Plaintiff.  (Id. ¶ 31.)  Plaintiff did not complain about coughing again while at Albermarle.  On December 29, 2000 Defendant submitted a sick call request asking for a refill of his prescription

for Allegra.[10]  (Id. ¶ 32.)

### 4. Randolph Correctional Center

Plaintiff was then transferred to Randolph Correctional Institution, arriving January 15, 2001.  Randolph had no smoke-free dorms, although smoking was restricted to authorized areas within the dorms, such as the day rooms.  However, inmates and guards regularly disregarded these restrictions.  Plaintiff was housed at Randolph for 16 days.

Upon arriving, Plaintiff notified prison officials of his aversion to ETS.  In response to this, Defendant Dixon, a prison lieutenant, "began to rant and rave ... and ordered that [Plaintiff] be placed in segregation." (Compl.¶ 27.)  However, Plaintiff was placed in E-Wing, the least smoke-filled wing of the prison.  (Id.)

Plaintiff was seen by Defendant Dr. Portner, who wrote  "irritation is likely secondary to irritation from smoke in dormitory environment and that inmate may benefit from a smokeless environment." (Plaintiff's Compl.¶ 29 and Exhibit 32.)  However, "in retaliation for complaining about the smoking in [E-Wing]," Plaintiff was subsequently moved into C-Wing, the most smoke-filled wing of the prison. (Compl.¶ 27.)  Plaintiff submitted an emergency grievance which was mishandled by Defendants Efrid and Wall.  On January 30, 2001 Defendant Wall met secretly with inmate Brenner and other inmates to discuss the grievance.  That evening, inmate Brenner and other inmates smoked cigarettes and marijuana in the sleeping area and were ignored by the correctional officers.  Plaintiff approached the correctional officer on duty and asked to be moved because inmates were creating smoke by burning paper and rags to harass Plaintiff.  The officer went through the area, stated that he did not smell anything and offered to

---

[10] Allegra is an antihistamine used to treat symptoms of allergic rhinitis.

open a window.

On the same evening, inmate Brenner called Plaintiff a snitch and attacked him with a padlock. Defendant Mark Smith stood by and smoked during the attack and then used pepper spray on Plaintiff. Plaintiff contends that the attack was instigated by Defendants Wall and Leonard who told inmates that Plaintiff reported them for smoking. Plaintiff was put in segregation on January 30, 2001 until he was transferred out of Randolph three days later for extended segregation, disciplinary hearing and demotion to close custody.

According to DOC Defendants, Plaintiff's bed assignments at Randolph were E-08 (January 16, 2001), C-34 (January 29, 2001) and C-26 (January 29, 2001). (Harvel Affidavit ¶¶ 8, 9.) Plaintiff's bed assignment within the C-wing was changed by Defendant Efrid on information from Defendant Leonard, Plaintiff's case manager, that Plaintiff had problems with an upper bunkmate (Efrid Affidavit ¶¶ 5-6.) The only time Plaintiff was assigned to segregation was on January 30, 2001. (Harvel Affidavit ¶ 8, 13.) Plaintiff attempted to submit an emergency grievance protesting his bed assignment on January 29 or 30, 2001. However, the grievance was returned to Plaintiff as it did not present an emergency matter. (Dail Affidavit ¶ 15 and Exhibit H.)

On January 20, 2001 Plaintiff submitted grievance 4445-2--1-007 complaining about smoke and smoking at Randolph (Harvel Aff. ¶ 11 and Ex. F.) This grievance does not state that Plaintiff reported violations of smoking policy to any staff member or state that staff refused to act on such information. Additionally, the unit physician had not ordered Plaintiff to be housed in a smoke free environment. (Dail Affidavit. ¶ 11.)

On January 30, 2001, Defendant Mark Smith saw Plaintiff in a fight with inmate

14

Christopher Brenner.  Plaintiff was hitting Brenner with a lock inside a sock.  Officer Smith gave several direct orders to stop fighting (Harvel Aff. Ex. G.)  Inmate Brenner was able to break away and ran past Defendant Smith.  Plaintiff, still swinging the lock, ran after Brenner.  Officer Smith pepper sprayed Plaintiff to stop him.  When Plaintiff and Brenner were later examined by medical staff  it was discovered that prior to the assault, Plaintiff stabbed Brenner in the abdomen with a pen.[11].

On January 18, 2001 Plaintiff was seen by Defendant Kendrick for a complaint of coughing at night "from the smoke."  (Smith Affidavit, Ex. D 1456) Upon examination, Plaintiff's lungs were clear and Defendant Kendrick did not observe any coughing, nasal congestion or drainage.  Defendant Kendrick referred Plaintiff to the unit physician.  Plaintiff was seen by Dr. Bruce Portner on January 29, 2001.  Dr. Portner noted that Plaintiff complained of congestion and determined that Plaintiff suffered from environmental allergy but no prescription was needed.  (Smith Affidavit, Ex, D 1443)

### 5. Marion Correctional Institution

Plaintiff was transferred to Marion Correctional Institution on March 12, 2001. The staff at Marion knew of Plaintiff's aversion to smoke because he had been housed there in 1996. Marion Correctional Institution (MCI) allowed prisoners to smoke in their cells, as long as the door was closed.  Additionally, inmates were permitted to smoke in the day rooms. However, some inmates ignored the rules, smoking in common areas, and prison officials failed to enforce the no-smoking policy.  Although Marion provided each inmate a single cell, the

---

[11] In the disciplinary hearing that followed, Plaintiff did plead guilty to fighting with a weapon and Inmate Brenner pled guilty to fighting.  (Dail Affidavit ¶ 13.)

circulation of smoke through vents made the presence of some level of ETS inescapable. (Compl. ¶ 40.)

Although Plaintiff submitted grievances and requests for smoke-free housing, he was routinely told that Marion's guards were enforcing the policy, and, because Marion was a single-cell prison, that "if [Plaintiff does] not allow smoking then [he] is in fact housed in a smoke free environment now." (Plaintiff's exhibit 14). Plaintiff's emergency grievances were set aside as not presenting an emergency. Despite these numerous grievances, Plaintiff remained in this situation for the duration of his term at Marion. (Compl.¶¶ 41-47.)

According to the DOC Defendants , Plaintiff was transferred to Marion on March 12, 2001. Smoking policy at Marion permitted inmates to smoke in their cells with the door closed or in the outside recreation areas. (Cothron Affidavit ¶ 7and Exhibit B at 3.) The air supply system at Marion completely exchanges the air in each cell approximately every ten minutes. This system makes it unlikely that air or ETS could flow from one cell to another (Id. ¶ 22.)

On March 18, 2001 Plaintiff submitted grievance F3730-01-3142 complaining that (I) he was exposed to ETS, (ii) officers ignored several inmates in Plaintiff's cellblock who smoked constantly and (iii) smoking policy was ineffective. Plaintiff designated grievance 3142 "emergency," but it did not meet policy guidelines for an emergency grievance. Grievance 3142 did not specify dates or times or locations where inmates violated smoking policy or identify officers who failed to enforce the policy. (Id. ¶¶ 9-11.) Responding to grievance 3142, Defendant Cothron reviewed information provided by Marion medical staff (Id. ¶ 11.) Before receiving the step one administrative response to grievance 3142, Plaintiff wrote letters to Defendants Beck, Bennett, Walker, Anderson and Harkelroad complaining about ETS. These

letters did not identify days or times when Plaintiff was exposed to ETS or staff who failed to enforce the smoking policy (Id. ¶ 12.)  Plaintiff also submitted a written request for smoke-free housing to Defendant Cothron.  The request did not specify specific days or times when Plaintiff was exposed to ETS or officers who failed to enforce smoking policy  (Id. ¶ 13.)  On April 7, 2001 Plaintiff submitted an additional grievance designated "emergency."  It referred to a printed notice authored by Defendant Cothron, posted throughout the facility, and instituting a "zero-tolerance"[12] policy for violations of smoking policy.  Plaintiff's second "emergency" grievance also failed to identify times when inmates violated smoking policy or staff who failed to enforce the policy (Id. ¶ 15.)

Plaintiff also submitted to Defendant Walker a memorandum dated April 8, 2001 that complained about ETS (Cothron Aff. Ex. N.)  The memorandum stated that on March 31, 2001 the cellblock was filled with smoke at midday.  In addition, on some unspecified day, Plaintiff complained to Officer Presnell about the smell of rags and paper burning, but Presenell did not smell anything.  Plaintiff also complained that, on the evening of April 8, 2001, Officer Beam observed an inmate smoking in the cellblock but failed to take action (Cothron Aff. ¶ 16.)  Defendant Anderson's April 10, 2001 response to Plaintiff's letters to Defendants Walker and Anderson noted medical staff had provided information that Plaintiff's medical records did not contain an order for smoke-free housing (Id. ¶ 17 and Ex. D.)  Defendant Walker responded to Plaintiff's second emergency grievance, explaining that the grievance did not present an emergency matter but could be resubmitted as a non-emergency grievance (Cothron Aff. Ex. P.).  Plaintiff did not resubmit the grievance.  (Cothron Aff. ¶ 18.)  Defendant Walker also responded

_____

[12] See Ex. M to Cothron Affidavit.

to Plaintiff's April 8, 2001 letter writing that he had investigated the allegation that staff were not enforcing the smoking policy and determined the allegation was not accurate. (Cothron Aff. Ex. Q and ¶ 19.) Defendant Anderson responded to Plaintiff's letters to Defendants Beck and Bennett, noting that documentation showed staff were enforcing smoking policy. (Cothron Aff. Ex. R and ¶ 20.)

During the period from February 11, 2001 through May 2, 2001, there were thirty-seven cases in which inmates were disciplined for violating smoking policy at Marion. On April 4, 2001, the date of posting the zero-tolerance notice, seven inmates were cited for violating smoking policy. (Cothron Aff. Ex. S and ¶ 21.)

During Plaintiff's incarceration at Marion, he complained about coughing, especially at night. When examined by a nurse on April 17, 2001, Plaintiff's chest and lungs sounded clear (Smith Affidavit. ¶ 41.) When examined by the nurse on May 1, 2001, Plaintiff's lungs were clear (Id. ¶ 42) and when examined by a nurse at Eastern Correctional on May 4, 2001, Plaintiff's breathing was unlabored, his lungs were clear and he and a nonproductive cough. (Id. ¶ 44.)

### 6. Eastern Correctional Institution

Plaintiff arrived at Eastern Correctional Institution on May 3, 2001 and was housed in a co-op unit, where there were no restrictions on smoking. Plaintiff alleges that prison guards and other officials observed inmates smoking in restricted areas and did nothing to stop them. (Compl.¶¶ 49, 59-73).

On May 3, 2001 Plaintiff filed a grievance 3400-01-C26 and Defendant Hardee responded that Eastern had established a policy governing smoking. Defendant Smith agreed

with Defendant Hardee's response and the IGRB denied relief (Dail Aff. Ex. A.)  In retaliation

for filing the grievance, Plaintiff was transferred to Fore Unit, where conditions were worse.  On

May 28, 2001 Plaintiff submitted grievance 3400-01-F022 (Dail Aff. Ex. E.)  Defendant

DeLoatch responded that Eastern had a smoking/no smoking policy in place and Plaintiff was

transferred from the Co-op unit because it was a work unit and Plaintiff did not have a job.

Plaintiff sought and received medical attention including albuterol and nebulizer

treatments while at Eastern.  Defendants Dr. Williams and Physicians Assistant De Vaul

acknowledged that a smoke free environment might be beneficial to Plaintiff, but failed to order

custody to provide this to Plaintiff.  Instead, "Williams' actual entry ... was simply that 'if

possible,' [Plaintiff] be housed in a smoke-free environment, indicating no actual 'need'

therefor." (Compl.¶ 57.)

Plaintiff submitted several grievances and requests for smoke-free housing, and made

numerous oral complaints to those in charge.  Many of his complaints at Eastern concerned the

lack of enforcement of existing smoking policy. (Compl.¶ 70.)  In retaliation for these grievances

and complaints, Plaintiff was sent to Pasquotank Correctional Institution on November 2, 2001.

(Id. ¶ 74.)

DOC Defendants contend that Plaintiff was transferred to Eastern on May 3, 2001 and on

that very day, Plaintiff filed grievance 3400-01-C26 complaining that no one had been informed

of his "aversion" to ETS and no smoke-free housing existed there.  Grievance C26 did not

identify any staff or inmates who violated smoking policy.  The step-one unit response stated that

Eastern had in force a smoking policy that applied to staff and inmates.  Plaintiff appealed

grievance C26 through all levels of administrative review (Dail Affidavit ¶ 6 and Ex. A.)

19

On May 28, 2001 Plaintiff wrote grievance 3400-01-F022, again complaining about his "aversion" to ETS and the lack of smoke-free housing. The grievance further stated that no-smoking signs were posted at Eastern but unnamed officials and inmates ignored the signs. Further, unnamed inmates smoked throughout the buildings without any action by unnamed officials. Grievance F022 also complained that, in retaliation for grievance C26, Plaintiff was transferred from the Co-op unit to a "mental health" unit. The step-one unit response explained that the Co-op unit provided housing for inmates with work assignments and Plaintiff was transferred because he did not have a work assignment. (Dail Affidavit ¶ 10 and Ex. E.)

While imprisoned at Eastern, Plaintiff was under the medical care of Defendants Dr. Williams and Physician Assistant DeVaul.[13] In a sick call request dated May 25, 2001, Plaintiff asked for additional medication for a self-described "ETS related cough." The nurse placed Plaintiff on the physician's assistant list for further evaluation and treatment (Smith Affidavit ¶ 48.) On June 7, 2001 Plaintiff complained of mild shortness of breath due to allergies. An order for a Nasacort inhaler was written and Plaintiff's prescription for Allegra was discontinued. Plaintiff did not complain about ETS (DeVaul Affidavit ¶¶ 5-7.)

In a sick call request dated June 15, 2001, Plaintiff complained of coughing and bloody mucous. On June 18, 2001 the nurse treating Plaintiff observed that his breathing was even and unlabored, his lungs sounded clear and he was not coughing (Id. ¶ 50.) Plaintiff complained of continued coughing at night, sneezing and a runny nose and was examined by Defendant Williams on June 19, 2001. Defendant Williams administered three peak flow tests and ordered

---

[13] Defendants Drs. Lightsey, DeVaul and Physician Assistant Williams filed a separate motion for Summary Judgment.

a nebulizer treatment and Plaintiff's peak flow returned to normal range. Defendant Williams' assessment was chronic cough, probably secondary to tobacco smoke exposure, post nasal drip or questionable side effects of Plaintiff's ACE inhibitor medication. Defendant Williams ordered that Plaintiff be given cough syrup and an Albuterol inhaler and that the ACE inhibitor Lotensin be discontinued (DeVaul Affidavit ¶ 8.) At Plaintiff's follow-up appointment on June 25, 2001, Defendant Williams' assessment was that discontinuation of Lotensin had resulted in improvement of Plaintiff's cough. Defendant Williams concluded that it was not necessary to order or

recommend smoke-free housing for Plaintiff (Id. ¶ 9.)

On July 9, 2001 Plaintiff was examined for complaints of chest pressure without pain and a cough and sneeze. Plaintiff admitted that he was a former smoker. Several tests were ordered including spirometry[14] and stress tests, the results of which suggested reversible airway disease and asthma. Plaintiff was instructed to use the Albuterol inhaler for three months. Plaintiff did not voice any other complaints at this time including ETS. (Id. ¶.)

On August 9, 2001 Plaintiff was seen on a follow-up visit for his allergic rhinitis. Plaintiff reported that his medications were helping and that he had no other complaints (DeVaul Affidavit ¶ 12.) On October 17, 2001, Plaintiff was seen for complaints of heartburn and acid reflux. He also complained that secondary smoke caused him to cough and sneeze. Defendant Williams recommended a smoke-free housing dorm if possible, however, Defendant Dr. DeVaul

---

[14] A spirometry test measures functional capacity of the lungs and may be used to diagnose lung disease. Asthma and emphysema are two types of obstructive lung diseases (Smith Affidavit ¶54.)

did not write an order for smoke-free housing. Plaintiff was transferred out of Eastern just over two weeks later on November 2, 2001.

### 7. Pasquotank Correctional Institution

Plaintiff was transferred to Pasquotank on November 2, 2001 and was written up on the day he arrived and placed in segregation for fifteen days. On November 17, 2001 Plaintiff was moved to a single cell in unit 4. Plaintiff contends that although Pasquotank had a smoking policy in place, it was uniformly unenforced. Plaintiff immediately filed a grievance, "which was intercepted" and rejected. (Compl.¶ 79). Defendant Sharpe, later responding to this grievance, noted that Randolph Defendant Portner had "suggested" smoke-free housing, but had not ordered it. Defendant Sharpe told Plaintiff that Pasquotank "cannot guarantee a smoke-free environment." (Id.).

Defendant Jordan, discussing this complaint with Plaintiff, told Plaintiff that Pasquotank "was as close to smoke-free housing as you're going to get in the North Carolina prison system," and ordered Plaintiff to "get out of his office 'bitching and crying.'" (Compl. ¶ 82.) Prison guards walking through the cell blocks ignored inmates smoking and smoked themselves. Defendant Bonner stated that guards had been told to leave inmates alone if seen smoking. (Id. 84).

Defendants Jordan, Parks, Tieberend, Bonner, Brown, Banks, Matthews, Jernigan, Riddick, Buffaloe, Noell, Deloatch, Moore, Sharpe, Hassell, Eason, Cohen, Dillard, Overton, Blowe, Hinton, White and O'Neill each witnessed inmates smoking and failed to enforce the no-smoking policy. (Complaint ¶¶ 90-103, 112, 114, 116-121, 123, 124-126, 131-136, 139-156). When Plaintiff approached Defendant White to complain about the levels of ETS and the failure

to enforce the no-smoking policy, Defendant White replied, "Just stay in your cell if you don't like the smoke. I'm not going to stop all of the other inmates here from smoking just because you have a problem with it." This episode is typical of those found across the ten pages of the complaint that detail these encounters. (Compl.¶ 135).

On January 8, 2002, Plaintiff was seen by Defendant Dr. Haque, Institutional Physician at Pasquotank. Plaintiff was concerned with his reactions to ETS, and wanted Dr. Haque to make an "unequivocal documentation of [Plaintiff's] serious and chronic aversion to ETS." (Compl ¶ 127.) However, Defendant Haque cursorily scanned the bridge of Plaintiff's nose and declared that Plaintiff had no sinus problems. Defendant Dr. Haque then asked Plaintiff "whether [Plaintiff] had filed a complaint with the State Medical Board against him," and pretended not to understand Plaintiff's speech. (Id.).

Defendant Bass, the nurse present during this exchange, dismissed Plaintiff's claims of ETS aversion. After hearing of Plaintiff's reactions to ETS, Defendant Bass simply responded that "everybody has the same reactions to tobacco smoke." (Compl. ¶ 128.) When Plaintiff "refused to accept her erroneous explications" an argument ensued and Defendant Bass had Plaintiff removed (Id.) Plaintiff filed a grievance concerning this episode, but Defendant Sharpe rejected it (Id.)

On February 5, 2002, Plaintiff again visited Medical and was seen by Defendant Bass. Plaintiff claimed he was experiencing "sinus problems and other reactions caused by [his] aversion to ETS." (Id. ¶ 137.) Defendant Bass refused to discuss Plaintiff's aversion to ETS, and would not refer Plaintiff to a respiratory specialist (Id.)

According to Defendant Dr. Hague, when he saw Plaintiff on January 8, 2002, Plaintiff

requested documentation from Dr. Hague stating that Plaintiff's housing had to be changed because of ETS. Dr. Hague denies that his examination consisted only of his flashing the light of his otoscope across the bridge of Plaintiff's nose. Dr. Hague recalls that Nurse Bass may have been present for some of the interaction between Plaintiff and Dr. Hague. Dr. Hague admits that on one occasion, he asked if Plaintiff had filed a complaint against him with the North Carolina Medical Board. (See Dr. Hague Motion to Dismiss, Document No. 143, 144.)

According to the DOC Defendants, on the day Plaintiff was transferred to Pasquotank, he argued with a correctional officer, used obscene language and referred to the officer as a "redneck." This incident resulted in a write-up and administrative segregation (Horton Affidavit ¶ 14.)[15]

On or about November 27, 2001 Plaintiff sent Defendant Bennett a notarized request for smoke-free housing. Plaintiff stated that he had an existing condition which was exacerbated by ETS. On the same day, Plaintiff also sent Defendant Sutton a similar notarized request in which Plaintiff again stated that he had an existing condition which was exacerbated by ETS. On December 12, 2001 Defendant Sutton replied to Plaintiff on behalf of himself and Defendant Bennett. The reply noted that Pasquotank had a smoking policy in place which designated smoking and nonsmoking areas and that Plaintiff had access to adequate non-smoking areas

---

[15] Other disciplinary actions against Plaintiff began on October 22, 2002 and June 5, 2003, but were dismissed and did not result in confinement in disciplinary segregation (Horton Affidavit ¶¶ 16-17; Exs D, G-J.) A disciplinary action which began on August 28, 2002 resulted in ten days in disciplinary segregation. Plaintiff was charged with forging the signature of Defendant Daniels. (Id. ¶ 15.) At the disciplinary hearing, Plaintiff admitted the charge. (Id.)

under the policy (Sutton Affidavit ¶¶ 7-8.)[16]

On or about December 18, 2001 Plaintiff sent Defendant Sutton a paper writing captioned as a court pleading, titled "plaintiff's Second Request for Smoke-Free Housing," and attaching a certificate of service. In that writing, Plaintiff demanded to be housed in a smoke-free area in the general prison population. Plaintiff stated that he has submitted an "emergency" grievance on December 3, 2001 but that the grievance was intercepted by Defendant Sharpe. Plaintiff also complained that inmates smoke in the day room and that officers observe this but do nothing. Defendant Sutton did not reply to Plaintiff's December 18, 2001 writing in light of his December 12, 2001 reply. (Id. ¶ 12.)

Defendant Jordon does not recall receiving a written request from Plaintiff for smoke-free housing but was aware that Plaintiff claimed he was entitled to smoke-free housing.[17] Jordon recalls a conversation with Defendant Horton about Plaintiff's claim. Jordon wrote a follow-up memorandum dated December 5, 2001 to Horton. Jordon learned, and the memorandum stated, that Plaintiff's medical record did not include a physician's order for smoke-free housing.

Defendant Jordon recalls a conversation with Plaintiff around December 6, 2001

---

[16] Pasquotank smoking policy limits smoking by inmates to designated areas. Each inmate is provided with an orientation booklet that includes information on the smoking policy. (Horton Afffidavit ¶ 9 and Ex. A.) Inmates may smoke inside their individual cells or in outside recreation area when assigned to the yard. Inmates with kitchen work assignments may smoke in a designated area of the kitchen. Smoking is prohibited in inmate day rooms (Sutton Affidavit ¶¶ 7-8, and Ex. C.)

[17] Plaintiff remained under the care of Defendant Dr. DeVaul while at Pasquotank. Dr. DeVaul did not believe there was a need to issue a DC-490 medical slip for smoke-free housing for Plaintiff (DeVaul Affidavit ¶ 19.) Plaintiff's medical records show, that while imprisoned at Pasquotank, he did not experience an acute exacerbation of asthms from exposure to any environmental irritant.

concerning the smoking policy at Pasquotank. Jordon believed that Plaintiff misrepresented that his medical record included a physician's order for smoke-free housing. After his conversation with Plaintiff, Defendant prepared and caused to be posted on bulletin boards in Unit IV a notice explaining the smoking policy. Jordon received a copy of Defendant Sutton's December 12, 2001 response to Plaintiff's written request for smoke-free housing (Jordon Affidavit ¶¶ 11-12..) Jordon's efforts to enforce the smoking policy included reminding any inmate observed smoking in the doorway of his cell that smoking was only allowed inside cells and explained that if seen violating the policy again, they would be written-up (Id. ¶ 16.)[18]

Between November 2, 2001 and November 12, 2001,[19] Plaintiff submitted or attempted to submit ten grievances at Pasquotank. In grievance 3720-01-01-0294 dated November 10, 2001, Plaintiff complained that a physician's order for thermal underwear was being ignored by custody staff (Sharpe Affidavit ¶ 6 and Ex. A.) In grievance 3740-04-01-0232 dated November 23, 2001 Plaintiff complained about the lack of a hot water dispenser (Id ¶ 7 and Ex. B.)

Next, Plaintiff attempted to submit grievance 3740-04-01-0239 dated December 3, 2001, as an emergency grievance (Sharpe Aff. Ex. C.) In this grievance Plaintiff complained that his medical records showed that he was required to be housed in a smoke-free facility, but in his assigned cellblock inmates were allowed to smoke cigarettes and cigars. Plaintiff complained that conditions in his cellblock caused him to cough and sneeze. Plaintiff demanded smoke-free housing and confiscation of incense and air sprays from inmate and that staff be required to

---

[18] Twenty-three inmates were disciplined at Pasquotank for violations of smoking policy while Plaintiff was housed there (Horton Affidavit ¶ 11 and Ex. C.).

[19] Plaintiff's Second Amended Complaint was filed on November 12, 2001.

enforce smoking policy. Defendant Sharpe reviewed this grievance and determined that it was not an emergency grievance and on December 6, 2001 the grievance was rejected because a prior grievance[20] had not completed step two review. Grievance 0239 was then resubmitted and accepted on December 13, 2001 (Id. ¶ 11.) In preparing a response to Plaintiff's grievance, Defendant Sharpe sought information from the Pasquotank Health Service Administrator, who indicated that a physician at another prison facility suggested that Plaintiff should be in a smoke-free environment if possible. On December 27, 2001, Defendant Sharpe communicated this information to Plaintiff and noted that Pasquotank policy permitted inmates to smoke in their individual cells but not in day rooms. Further, Sharpe stated that he would reiterate that custody staff must enforce the smoking policy (Sharpe Affidavit ¶¶ 8 -13 and Ex. C.)

Next, Plaintiff filed grievance 3720-04-02-0008 dated January 21, 2002 complaining that Defendants Dr. Haque and Nurse Bass (now Throckmorton) refused to document a need for smoke-free housing in Plaintiff's medical record (Sharpe Affidavit ¶ 14 and Ex. D.) Defendant Sharpe responded to this grievance stating that there was no documented medical condition requiring Plaintiff's transfer to another environment. (Id. ¶ 15.)

In grievance 3740-04-02-0041, received February 22, 2002, Plaintiff complained that Officer Simpson interfered with Plaintiff's medical care appointment (Sharpe Aff. Ex. E and ¶ 16.) In grievance 3740-04-02-0081 dated April 5, 2002 Plaintiff complained about not receiving medically-ordered thermal underwear (Id. ¶ 17 and Ex. F.) On May 3, 2002, Plaintiff complained about personal property allegedly missing since November 2, 2001 and requested return of thirty items (Id. ¶ 18 and Ex. G.) In related grievance 3740-04-02-0139, received June

---

[20] Grievance 0232

10, 2002, Plaintiff again complained about missing property. (Id. ¶ 19 and Ex. H.) In grievance 3740-04-02-0197, dated August 10, 2002, Plaintiff complained about sanitation in the food service and preparation area (Id. ¶ 20 and Ex. I.) In grievance 3740-04-02-0236, dated September 20, 2002, Plaintiff complained that he received notice of rejection of legal publications, appealed the rejection and did not receive a copy of the rejection notice indicating his appeal (Id. ¶ 21 and Ex. J.) In grievance 3740-04-0285, dated November 4, 2002, Plaintiff complained that he received only two pages of carbon papers weekly and could not complete his legal work (id. ¶ 22 and Ex. L.)

In grievance 3720-04-02-319, dated November 26, 2002, Plaintiff complained that Defendants Matthews, Blowe and Jordon seized legal documents from his cell and refused to return the documents to him. Further, this prevented Plaintiff from meeting a filing deadline in a case pending in United States District Court for the Eastern District of North Carolina. The response to this grievance showed the search of Plaintiff's cell was made pursuant to an investigation of his conducting business at Pasquotank and legal papers relating to another inmate were seized from Plaintiff's cell (Id. ¶ 23 and Ex. M.) In grievance number 3740-03-03-0028, dated January 28, 2003, Plaintiff attempted to appeal from a disciplinary punishment imposed October 10, 2002. Plaintiff also claimed that he was disciplined in retaliation for an earlier grievance in which he complained about rejection of legal materials he had ordered. This grievance was rejected under policy and returned to Plaintiff (Id. ¶ 27 and Ex. O.)

### 8. Hartnett Correctional Institution

According to DOC Defendants, Defendant Hall has been working at Hartnett Correctional Institution continuously since 1995. During this time, Plaintiff has never been

imprisoned at Hartnett (Hall Affidavit ¶¶ 2, 6.)  In September 2000 Defendant Hall wrote to

Plaintiff and now believes he wrote in response to a request from Plaintiff to be transferred to

Hartnett (Id ¶¶ 7-8, Ex. A) Hall did not have authority to approve transfers of inmates from other

facilities to Hartnett (Hall ¶ 4.)  Additionally, if management in charge of transfers had decided

to transfer Plaintiff to Hartnett, Hall could not have prevented such a transfer (Id. ¶ 11.)

### III. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be

 granted where "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with affidavits, if any, show that there is no genuine issue of material fact and that the

moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  This standard, by

its very terms, provides that the mere existence of some alleged factual dispute between the

parties will not defeat a properly supported summary judgment motion; rather the rule requires

that there be no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

247-48 (1986).  A genuine issue exists only if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  Id. at 248.  "Only disputes over the facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment."  Id.  Moreover, the moving party has the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any,' which it believes will demonstrate the absence of any genuine issue of material fact."

Celotex Corp. v. Cateret, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P.56(c)).

In opposing a summary judgment motion, "the non-moving party must do more than

present a mere 'scintilla' of evidence in his favor. Rather, the non-moving party must present

sufficient evidence such that "reasonable jurors could find by a preponderance of the evidence

for the non-movant." Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995)

(quoting Anderson, 477 U.S. at 252). An apparent dispute is "genuine" only if the non-movant's

version is supported by sufficient evidence to permit a reasonable jury to find in its favor. Id, "If

the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted." Anderson, 477 U.S. at 249-50. Furthermore, at the summary judgment stage, "the

judge's function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." Id. at 249.


# IV. ANALYSIS

## A. Prison Litigation Reform Act and Other Issues

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to

exhaust "such administrative remedies as are available" before suing over prison conditions.

There is no doubt that the PLRA's exhaustion requirement is mandatory. See Anderson v. XYZ

Correctional Heath Services, 407 F.3d 674, 676-77 (4th Cir. 2005) citing Porter v. Nussle, 534

U.S. 516, 524 (2002) ("once within the discretion of the district court, exhaustion in cases

covered by § 1997e(a) is now mandatory. All available remedies must now be exhausted; those

remedies need not meet federal standards, nor must they be plain, speedy and effective. Even

when the prisoner seeks relief not available in the grievance proceedings, notably money

damages, exhaustion is a prerequisite to suit." When considering a motion to dismiss for failure

to exhaust, the district court must determine whether exhaustion was complete at the time of

filing, not at the time when the court is rendering its decision on the Motion to Dismiss.  Johnson v. Jones, 340 F.3d 624 (8th Cir. 2003).

Recently, the Fifth Circuit addressed the issue of "what a prisoner must say in his grievances to properly exhaust his claims."  Johnson v. Johson, 385 F.3d 503 (5th Cir. 2004).  The Court reasoned that the PLRA exhaustion requirement must be interpreted "in light of its purposes, which include the goal of giving officials 'time and opportunity to address complaints internally.'"  Id. at 516 (quoting Porter v. Nussle, 534 U.S. 516, 525 (2002)).  For example, as to a claim that a guard acted improperly, the prisoner must provide "details regarding who was involved and when the incident occurred, or at least other available information about the incident that would permit an investigation of the matter."  Id. at 517.  Of course, legal theories need not be presented in a grievance.  Id.  To give prison administrators fair opportunity to address a problem that might from the basis for a civil rights action, the prisoner's grievance must "identify individuals who are connected with the problem."  Id. at 32.  The grievance must alert prison officials to a problem, not provide notice that a particular official may be sued.  Id. at 522.  However, at the same time, the grievance must provide prison administrators with a fair opportunity to address the problem that may later form the basis of a suit and for many problems this will require that the prisoner's grievance identify individuals who are connected with the problem.  Id.

### 1. Defendant McRavin at Craven

The only named Defendant at Craven Correctional Institution is Lucius E. McCravin. The record shows that while at Craven, Plaintiff filed only one grievance (Grievance 3085-99-0770 - attached to Defendants' Reply to Plaintiff's Summary Judgment Response, Ex. AA.)  In

his grievance, Plaintiff complained that [he had] been retained at this facility for in excess of 2 weeks and subjected to gross amounts of ETS:..."   However Plaintiff does not name Defendant Mcravin, fails to mention his confining Plaintiff to a cage and fails to indicate that Defendant McRavin exposed Plaintiff to unconstitutional levels of ETS at Craven.  In short, Plaintiff did not exhaust his remedies as to Defendant McRavin.[21]

### 2. Defendants at Franklin and Defendants Beck and French

Plaintiff submitted and exhausted only one grievance complaining about ETS at Franklin. Grievance 4215-00-283 did not name or identify any staff who allegedly violated smoking policy at Franklin.[22]   Specifically, Plaintiff complained that the dormitory duty officer, Officer Best, was smoking a cigar that aggravated his sinus condition.[23]   Three months later, on July 14, 2000, Plaintiff attempted to submit another grievance complaining about ETS.  In that grievance, Plaintiff complained that the officer on duty was sitting behind the fan smoking a cigar.  The

---

[21] Additionally, Plaintiff has not alleged any injuries resulting from his being locked in a cage for several hours.  A plaintiff alleging an excessive force claim is required to allege something more than de minimus injury.  Norman v. Taylor, 25 F.3d 1259, 1263 (4th Cir. 1994). Furthermore, a plaintiff challenging the conditions of his confinement must also produce evidence of serious or significant physical or emotional injury resulting from challenged conditions to withstand summary judgment.  Strickler v. Waters, 989 F.2d 1375, 1380 (4th Cir. 1993); but see 42 u.s.c. § 1997(e)(prisoner cannot maintain a § 1983 action for metal or emotional injury absent physical injury).  Plaintiff has not alleged any injury.  Therefore, Plaintiff's claim against Defendant McRavin is dismissed for this reason as well.

[22] While the grievance did not specifically name any staff at Franklin, Plaintiff names the following Franklin staff as defendants: Officers Baucom, Anthony Best and William Spruill; Lieutenany Anthiny Beckham; Captain R.D. Britton; Sergeant Donald Colbert; Assistant Superintendent Selma Townes ; and Captain Larry Winstead.

[23] The step one response stated that the duty officer was smoking in the control center, a designated smoking area.  When Plaintiff complained Defendant Barbee turned on an exhaust fan to clear the smoke.  Defendant Townes was satisfied that staff took appropriate action to resolve Plaintiff's complaint.

grievance was delayed because Plaintiff had submitted another grievance that had not yet completed the step two administrative level. Plaintiff did not resubmit this grievance or submit any other grievances complaining about ETS (Townes Affidavit ¶ 12.)

The step one response, provided by Defendant Beckham, was that Defendant Best was smoking in an area designated for this purpose. Further, when Plaintiff complained, Defendant Barbee turned on the exhaust fans to clear the smoke. Defendant Townes provided the step two response based on her review of staff's actions taken to address Plaintiff's problem.

Applying the above cited law and interpreting Plaintiff's grievance liberally, DOC Defendants admit that it could be argued[24] that Plaintiff has exhausted his administrative remedies as to Defendants Best, Barbee, Beckham, and Townes. This Court disagrees that simply because Defendants Barbee and Townes provided the responses to Plaintiff at step one and step two that qualifies as exhaustion of administrative remedies as to those defendants. However, since Defendant Best was identified as the person smoking in Plaintiff's exhausted grievance and likewise, Defendant Barbee was identified as the officer who turned on the exhaust fan in response to Plaintiff's complaint about Defendant Best's smoking, the Court concludes that Plaintiff has exhausted his administrative remedies as to Defendants Best and Barbee. The remaining Defendants from Franklin Correctional are dismissed for failure to exhaust.[25]

As to Defendants Townes, Beck and French, Plaintiff cannot proceed on a theory of

---

[24] While they make this argument, they do not concede that Plaintiff has exhausted his administrative remedies with respect to Defendants Beckham or Townes.

[25] Even if this Court had found that Plaintiff had exhausted his remedies as to all the Franklin Defendants, as this Court has explained in section IV, B, Plaintiff has not stated an Eighth Amendment claim and therefore alternatively, the Franklin Defendants, including Defendants Best and Barbee are dismissed for that reason as well.

respondeat superior. See Monell v. Department of Social Services, 436 U.S. 658, 694 (1978); Lopez v. Robinson, 914 F.2d 486, 494 (4th Cir. 1990); Shelton v. Angelone, 183 F.Supp 830, 836 (W.D. Va. 2002). However, supervisory liability may be found where conduct directly causing deprivation of a constitutional right is undertaken to effectuate some policy or custom for which an official is responsible. Fisher v. Washington Metro Transit Auth., 690 F.2d 1133, 1142-43 (4th Cir. 1982).

Staff at Franklin took action to exhaust the ETS complained of by Plaintiff. Plaintiff cannot show that Defendants Townes, Beck and French had knowledge of a "pervasive and unreasonable risk of constitutional injury" to Plaintiff. Shaw v. Stroud, 13 F.3d at 799. Moreover, Plaintiff did not serve any discovery requests on Defendant French. Plaintiff's three discovery requests served on Defendant Beck failed to ask for or elicit any facts relating to knowledge of Plaintiff's alleged ETS exposure at Franklin. For these additional reasons, claims against Beck and French are dismissed.

### a. Defendant Dr. Lightsey

Plaintiff alleges that Defendant Dr. Lightsey, prison physician, erroneously determined that Plaintiff's medical problems were not connected to ETS, and did so in a condescending manner.

It appears that Plaintiff also did not exhaust his administrative remedies against Defendant Dr. Lightsey. While Dr. Lightsey filed a separate Motion for Summary Judgment which did not raise exhaustion, this Court has throughly reviewed the grievances Plaintiff filed while at Franklin and concludes that Plaintiff did not file a grievance complaining about his medical care while at Franklin. Moreover, Plaintiff did not file a grievance against Dr. Lightsey. Therefore, the Court

concludes that Plaintiff did not exhaust his administrative remedies against Dr. Lightsey and Dr. Lightsey is dismissed for this reason. However, this Court will also address Plaintiff's deliberate indifference claim against Dr. Lightsey.

The Court construes Plaintiff's claim against Dr. Lightsey as a deliberate indifference claim under the Eighth Amendment. Talking Plaintiff's sparse allegations against Dr. Lightsey as true, they fail to make out a claim for relief. A prisoner makes out a claim under the Eighth Amendment if he can establish that prison medical staff was deliberately indifferent to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment violation occurs only if the medical need is serious. Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). Additionally, prison officials cannot be held liable under the Eighth Amendment unless they knew of and disregarded an excessive risk to an inmates health or safety. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Deliberate indifference may be demonstrated by either actual intent or reckless disregard. Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). A defendant acts recklessly by disregarding a substantial risk of danger that is either known to him or which would be apparent to a reasonable person in his position. See Miltier, 896 F.2d at 852-53. However, a plaintiff must prove that defendant was aware of facts showing a substantial risk of harm and also drew the inference that a substantial risk of harm existed. See Johnson v. Quinones, 145 F.3d 164, 167-68 (4th Cir. 1998).

Here, Plaintiff complains that Dr. Lightsey was deliberately indifferent to his serious medical needs because Dr. Lightsey erroneously determined that Plaintiff's medical problems were not connected to ETS, and did so in a condescending manner. Plaintiff's allegation amounts to a disagreement with his doctor regarding his medical treatment or, at most,

35

negligence.  Neither of which are actionable in the context of a § 1983 suit.  Disagreements over the quality and extent of medical care do not state a claim for relief for deliberate indifference. Estell, 492 U.S. 97 (1976).  Following Estelle, the Fourth Circuit expressly held that "[d]isagreements between an inmate and a physician over the inmates's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged."  Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1984).  To be actionable, an inmate's treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness."  Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).  Additionally, simple negligence is not a constitutional deprivation.  Daniels v. Williams, 474 U.S. 327 (1986); Estelle v. Gamble, 429 U.S. 97, 105-106 (1976).  Plaintiff has simply not alleged any facts which establish that Dr. Lightsey engaged in any conduct which was deliberately indifferent or constitutionally inadequate.  Therefore, Dr. Lightsey is  dismissed and Dr. Lightsey's Motion for Summary Judgment is Granted.

### 3. Defendants at Albemarle and Defendant Beck

Plaintiff only submitted one grievance complaining about ETS while at Albermarle. However, grievance 4590-00-SEG-177, dated November 21, 2000 does not name any officers or staff to whom Plaintiff complained about smoking policy violations and does not name any officers or staff who allegedly failed or refused to enforce the smoking policy.  Instead Plaintiff complained that he was required to be housed in segregation because inmates smoked in all the dormitories.

In addition to the one ETS grievance, Plaintiff also allegedly wrote to defendant York at several unspecified times about smoking at Albemarle.  However, letters to prison officials are

not grievances and cannot prove exhaustion of administrative remedies. Similarly, on January 14, 2001, Plaintiff allegedly discussed his problems with Defendant Tucker. Again, conversations, like letters, do not satisfy the exhaustion requirement. Finally, it appears that Plaintiff may have written to Defendant Beck complaining about ETS exposure at Albermarle. However, as already noted, letters to prison officials are not grievances and do not satisfy the PLRA's exhaustion requirement.[26]

Plaintiff's November 21, 2000 grievance fails to give notice that any Defendant was ignoring smoking policies at Albermarle. Therefore, the Court concludes that Albemarle Defendants are dismissed because Plaintiff failed to exhaust his administrative remedies as to any Defendants at Albemarle.[27]

Next, Plaintiff alleges that he was subjected to retaliatory disciplinary action on December 11, 2000 because he complained about ETS. First, Plaintiff did not submit a grievance complaining about retaliatory disciplinary action at all. Therefore, this claim is not exhausted. Next, Plaintiff did not file a grievance related to ETS on December 11, 2000. Finally, Plaintiff plead guilty to a disciplinary violation of using profane language.

Plaintiff's retaliation claim must fail not only because Plaintiff did not exhaust this claim but also because the claim fails as a matter of law. In order to establish a retaliation claim, an

---

[26] To the extent that Plaintiff is proceeding against Defendant Beck on a claim of ETS exposure at Albermarle on a theory of respondeat superior, the same reasoning requiring dismissal against Defendant Beck at Franklin, set our above, requires dismissal of any ETS claim at Albemarle.

[27] Even if this Court had found that Plaintiff had exhausted his remedies as to all the Albemarle Defendants, as this Court has explained in section IV, B, Plaintiff has not stated an Eighth Amendment claim and therefore alternatively, the Albemarle Defendants are dismissed for that reason as well.

inmate must show that his constitutionally protected right was the motivating factor behind some adverse and allegedly improper action by an official. <u>Mount Healthy City School Board of Education v. Doyle</u>, 429 U.S. 274, 287 (1977); <u>Adams v. Rice</u>, 40 F.3d 72 (4th Cir. 1994). If the plaintiff carries this burden, the court should then determine whether the defendant has shown by a preponderance of the evidence that the same action would have been taken absent protected conduct.

The disciplinary hearing record shows that Plaintiff addressed Defendant Witherspoon as "honey." When directed not to use such language, he then addressed her as "baby" and or "sugar." Plaintiff cannot rebut the showing that evidence existed to support his disciplinary conviction. Additionally, it is likely that the same action would have been taken regardless of any complaint about ETS exposure. Therefore, Plaintiff's retaliation claim is dismissed.

### 4. Randolph Defendants

Defendants named in the Complaint who have been served with process include (former) Superintendent Smith[28]; Assistant Superintendent Harvel; Correctional Sergeants Brewer, Buntin, Dixon and Efrid: Correctional Officer Mark Smith; (former) Unit physician Dr. Bruce Portner; Nurses Johnson and Kendrick; (former) Programs Supervisor Wall; and (former) Programs Assistant Leonard. Plaintiff submitted only one grievance complaining about ETS at Randolph. The grievance (4445-2-1-007) was submitted on January 20, 2001 and includes

---

[28] Plaintiff's Complaint fails to allege any direct involvement by Defendant Raymond Smith, former Superintendent at Randolph. As explained in the section regarding Defendant Townes, Plaintiff cannot proceed against Defendant Smith or his successor in office on a theory of respondeat superior. The same legal theories on policy and custom outlines with respect to Defendant Townes apply to Defendant Smith. Therefore, any supervisory liability claim against Defendant Smith is dismissed.

Plaintiff's complaint that he could not use the day rooms due to smoke and that some inmates were smoking in the sleeping quarters (Harvel Affidavit and Ex. F.) By way of his grievance, Plaintiff specifically requested smoke free housing. Plaintiff's grievance does not state that he reported any smoking policy violations to any staff member and does not name any staff member who allegedly witnessed such violations or refused to act on information provided by Plaintiff. As such, this Court concludes that Plaintiff has not exhausted his administrative remedies as to any Randolph Defendants and therefore they are dismissed.[29]

### a. Retaliation and Conspiracy Claims

On January 15, 2001 Plaintiff claims that Defendant Dixon retaliated against him for complaining about ETS by ordering Plaintiff to segregation. Plaintiff also claims that Defendants Searcy-Walls and Leonard conspired together to provoke a racially motivated assault on Plaintiff by another inmate. First, Plaintiff did not file a grievance with respect to his claim against Defendant Dixon for retaliation or against Defendants Searcy-Walls or Leonard for conspiracy. Therefore, these claims have not been exhausted. Next, the documents submitted in support of summary judgment reflect that Plaintiff was transferred to Randolph on January 16, 2001 and was confined in segregation beginning on January 30, 2001. The reason Plaintiff was sent to segregation was because he got into an altercation with inmate Brenner. Plaintiff's allegations that Defendant Dixon retaliated against him[30] and that Defendants Searcy-Walls and

---

[29] Even if this Court had found that Plaintiff had exhausted his remedies as to all the Randolph Defendants, as this Court has explained in section IV, B, Plaintiff has not stated an Eighth Amendment claim and therefore alternatively, the Randolph Defendants are dismissed for that reason as well.

[30] The fact that Plaintiff plead guilty to fighting with a weapon, which was what sent him to segregation, completely belies his claim that Defendant retaliated against him for complaining

Leonard conspired to have him attacked by another inmate are conclusory and not supported by the record.  Plaintiff's retaliation and conspiracy claims are dismissed because they are unexhausted and conclusory.

### b. Defendant Efrid

Plaintiff claims that Defendant Efrid retaliated against him by changing his bed assignment on January 29, 2001.  Although it appears that Plaintiff attempted to submit a grievance about this matter, which Plaintiff designated as an "emergency grievance," the grievance was returned to Plaintiff and he did not resubmit any grievance complaining about changes to his bed assignment.  Because Plaintiff did not fully exhaust the administrative grievance procedure with respect to his claim that Defendant Efrid retaliated against him by changing his bed assignment, this claim must be dismissed.

### c. Defendant Dr. Portner and Defendant Kendrick

On January 18, 2001 Plaintiff was seen by Defendant Kendrick for a complaint of coughing at night "from the smoke."  (Smith Affidavit, Ex. D 1456) Upon examination, Plaintiff's lungs were clear and Defendant Kendrick did not observe any coughing, nasal congestion or drainage.  Defendant Kendrick referred Plaintiff to the unit physician.  Plaintiff was seen by Dr. Bruce Portner on January 29, 2001.  Dr. Portner noted that Plaintiff complained of congestion and determined that Plaintiff suffered from environmental allergy but no prescription was needed. (Smith Affidavit, Ex, D 1443.)

Plaintiff has not submitted any grievances with respect to either of these medical Defendants.  Therefore, Plaintiff has failed to satisfy his obligation under the PLRA that

---

about ETS by sending him to segregation

grievances must be exhausted prior to filing a lawsuit and Defendants Doctor Portner and

Defendant Kendrick must be dismissed..

### 5. Marion Defendants and Defendants Easley, Beck and Bennett

Named parties employed at Marion Correctional Institution who were served with process

and have not already been dismissed include Assistant Superintendent Ricky Anderson, Unit

Manager David Cothron, Assistant Superintendent Sidney Harkleroad, Assistant Unit Manager

Denise Jackson, Classification Coordinator Wayne Spears and Superintendent Dean Walker.

Plaintiff submitted and exhausted one grievance complaining about ETS while at Marion

Correctional Institution.  On March 18, 2001 Plaintiff submitted grievance F3730-01-3142

complaining that (I) he was exposed to ETS, (ii) officers ignored several inmates in Plaintiff's

cellblock who smoked constantly and (iii) smoking policy was ineffective.  Plaintiff designated

grievance 3142 "emergency," but it did not meet policy guidelines for an emergency grievance.

Moreover, a review of grievance 3142 shows that Plaintiff did not specify dates or times or

locations where inmates violated smoking policy or identify officers who failed to enforce the

policy.

The Court concludes that Plaintiff's grievance 3142 does not satisfy the PLRA's

exhaustion requirement as to the Marion Defendants because his grievance does not identify any

officers who allegedly failed to enforce the smoking policy.  As such, the claims against the

Marion Defendants must be dismissed.[31]  Plaintiff also claims that he complained in writing to

---

[31] Even if this Court had found that Plaintiff had exhausted his remedies as to all the
Marion Defendants, as this Court has explained in section IV, B, Plaintiff has not stated an
Eighth Amendment claim and therefore alternatively, the Marion Defendants are dismissed for
that reason as well.

Defendants Beck, Bennett, Walker, Anderson and Harkleroad about ETS exposure and requested smoke- free housing. As discussed previously, letters do not satisfy the PLRA's mandatory exhaustion procedure.

### a. Defendant Easley

The sole allegation against Defendant Governor Easley is that Plaintiff submitted a request to him for smoke-free housing. First, submitting a letter, does not satisfy the mandatory exhaustion requirement of the PLRA. Next, assuming Plaintiff's claim against Governor Easley is based upon a theory of respondeat superior, this claim must fail for the reasons discussed above with respect to Defendant Townes.

### 6. Eastern Defendants

Named parties employed at Eastern Correctional Institution who were served with process and have not already been dismissed include Correctional Sergeant James Adams; Correctional Officers John Anderson, Alonza Holloway, Michael L.. Knox, Sonya Miller, Danny Moye, Williams Stallings, Teresa Vines, and Frances Washington; Assistant Superintendent Larry Dail; Assistant Unit Manager Bobby Deloatch; Unit Managers M.A. Hardee and Cecil N. Herring; and Captain Lewis. Medical staff served with process include Defendants Dr. Chanson DeVaul and Physician's Assistant Glen Williams. The record establishes that Plaintiff submitted grievance 3400-01-C26, on May 3, 2001 (Dail Aff. Ex. A and ¶ 6.) However, this grievance failed to identify any staff or inmates who violated smoking policy at Eastern. Plaintiff also submitted grievance 3400-02-F022 on May 28, 2001 (Dail. Aff. Ex. E and ¶ 10.) This grievance also did not identify any staff or inmates who violated smoking policy.

The Court concludes that Plaintiff's two grievances do not satisfy the PLRA's exhaustion

requirement as to the Eastern Defendants because his grievances do not identify any Eastern staff who allegedly failed to enforce the smoking policy. As such, the claims against the Eastern Defendants must be dismissed.[32][33]

### a. Defendants Dr. DeVaul and Physician Assistant Glen Williams

Plaintiff alleges that because Dr. DeVaul and Physician Assistant Glen Williams failed to order a smoke-free environment, they were deliberately indifferent to his serious medical needs. Plaintiff further contends that Defendant Glen Williams recommended a smoke-free environment but that Dr. DeVaul did not specifically order that he be housed in a smoke-free environment. Defendants do not disagree that Glen Williams recommended a smoke-free environment or that Dr. DeVaul did not order custody to house Plaintiff in a smoke-free environment.[34]

The Court has set forth the law with respect to an Eighth Amendment deliberate indifference claim in the section on Dr. Lightsey above and will not do so again here. However,

---

[32] Even if this Court had found that Plaintiff had exhausted his remedies as to all the Eastern Defendants, as this Court has explained in section IV, B, Plaintiff has not stated an Eighth Amendment claim and therefore alternatively, the Eastern Defendants are dismissed for that reason as well.

[33] Furthermore, Plaintiff's Complaint alleges ETS exposure on July 11,12, 13 and 16 and also on August 9, 2001. However, Plaintiff did not submit any grievances complaining about ETS exposure after May 28, 2001. Accordingly, he has failed to exhaust ETS claims against any Eastern Defendant based on exposure after that date.

[34] While Dr. DeVaul and Defendant Williams filed a separate Motion for Summary Judgment which did not raise exhaustion, this Court has throughly reviewed the grievances Plaintiff filed while at Eastern and concludes that Plaintiff did not file a grievance complaining about his medical care while at Eastern. Moreover, Plaintiff did not file a grievance against Dr. DeVaul or Defendant Williams. Therefore, the Court concludes that Plaintiff did not exhaust his administrative remedies against Dr. DeVaul or Defendant Williams and they are dismissed for this reason. However, this Court will also address Plaintiff's deliberate indifference claim against Dr. DeVaul and Defendant Williams.

applying that same law to Plaintiff claims against Dr. DeVaul and Glen Williams, it is clear that Plaintiff's claim must fail. Essentially, Plaintiff disagrees with Dr. DeVaul's decision not to order that he be housed in a smoke-free environment. Dr. DeVaul felt that Glen Williams recommendation that Plaintiff be housed in a smoke-free environment, if available, was sufficient but decided not to order custody to house Plaintiff in a smoke-free environment because Dr. DeVaul found no medical reason to justify such an order (DeVaul Affidavit ¶ 20.)

"What has been clear since Estelle, is that with regard to medical care, not every denial violates the Constitution." Oliver v. Deen, 77 F.3d 156 (7th Cir. 1996). In Clemmons v. Bohannon, 956 F.2d 1523 (10th Cir. 1992) (en banc), the plaintiff admitted that he was provided medications. The medical records and affidavits established that when he complained of problems, the medical staff examined him and assessed the complaints. Finally, the doctor stated his belief that ETS had not imperiled the plaintiff's health. Based upon this evidence the court held:

> Clemmons presents no competent evidence showing prison medical personnel were convinced that the cause of his problems was ETS exposure requiring a non-smoking cell. Because Clemmons has not shown deliberate indifference and the Eighth Amendment does not apply to claims based on inadvertent failure to provide adequate care, negligent misdiagnosis, or an inmate's difference of opinion with medical personnel regarding diagnosis or treatment, summary judgment for the defendants is proper.

Id. at 1529. In similar fashion, Plaintiff here has admitted that he received multiple treatments and medications from Defendants Dr. DeVaul and Williams, that he was examined by the medical staff each time he complained, and that his symptoms were assessed and addressed. The decision by Dr. DeVaul and Physician Assistant Williams to order or not to order a non-smoking dorm is a matter of medical judgment. The evidence in this case established that this medical judgment was

not made indifferently.  The Plaintiff's need for a non-smoking dorm was assessed but determined that there was no medical reason for such an order.  (DeVaul Affiavit.)

The medical records and affidavits establish that Dr. DeVaul and Physician Assistant Williams evaluated Plaintiff's complaints on multiple occasions; that tests were ordered to evaluate Plaintiff's symptoms; that medications were prescribed; and that the Plaintiff's response was reassessed on multiple occasions.  As the Fourth Circuit noted in Johnson v. Quinones, 145 F.3d 164, 169 (4th Cir. 1998), "these actions are hardly consistent with someone who is deliberately indifferent to or 'recklessly disregarding' a serious medical condition."  Plaintiff has failed to establish  that Defendants DeVaul and Williams were deliberately indifferent to his serious medical needs. Therefore, Defendants' DeVaul and Williams' Motion for Summary Judgment is Granted.

### 7.Pasquotank Defendants

Named parties employed at Pasquotank Correctional Institution who were served with process and have not already been dismissed include Defendants Ruth Banks, Carl Battle, William Blowe, Winston Bonner, Derrick Brown, Robert Buffaloe, Tonya Coehns, Dennis Daniels, Sean Dillard, David Eason, Joseph Harrell, Melvin Horton, Selenamarie Jernigan, Ricky Jordon, Susan Mathews, Debra Nowell, David O'Neil, Romell Overton, Farrah Parks, Carolina Riddick, Donna Riddick, Dennis Tiberebt, Joseph White, Ernest Sutton, Boyd Bennett, Nurse Bass, Defendants Sharpe, Harnell, Stratan and Dr. Hague.  Plaintiff filed grievance 3740-04-01-239 regarding ETS exposure at Pasquotank on December 13, 2001.  The grievance did not identify any staff who allegedly failed to enforce the smoking policy and did not specify times or places where inmates smoked in violation of policy.   Plaintiff contends that he also submitted a grievance on December 18, 2001 in which he complained about ETS.  However, the DOC Defendants have no record of such grievance and argue

that given grievance 239 dated December 13, 2001, any grievance dated December 18, 2001 would have been rejected pursuant to the policy that only one grievance can be pending at a time. There is no evidence in the record that Plaintiff attempted to resubmit the December 18, 2001 grievance. Plaintiff contends that he also submitted a grievance on December 22, 2001. The DOC Defendants again argue that if Plaintiff attempted to file such a grievance, it would have been rejected pursuant to policy because grievance 236 did not complete step two review until January 11, 2002, There is no evidence in the record that Plaintiff attempted to resubmit the December 22, 2001 grievance.

The Court concludes that Plaintiff's grievance regarding ETS does not satisfy the PLRA's exhaustion requirement as to the Pasquotank Defendants because the grievance does not identify any Pasquotank staff who allegedly failed to enforce the smoking policy. As such, the claims against the Pasquotank Defendants must be dismissed.[35]

### a. Defendants Bennett, Sutton and Horton

In addition to the fact that Plaintiff has not satisfied the PLRA's exhaustion requirements as to Defendants Bennett, Sutton and Horton, he also fails to allege any direct involvement by these Defendants. As explained in the section regarding Defendant Townes, Plaintiff cannot proceed against Defendants Bennett, Sutton and Horton on a theory of respondeat superior. The same legal theories on policy and custom outlined with respect to Defendant Townes apply to Defendants Bennett, Sutton and Horton. Therefore, any supervisory liability claim against Defendant Bennett, Sutton and Horton is dismissed.

---

[35] Even if this Court had found that Plaintiff had exhausted his remedies as to all the Pasquotank Defendants, as this Court has explained in section IV, B, Plaintiff has not stated an Eighth Amendment claim and therefore alternatively, the Pasquotank Defendants are dismissed for that reason as well.

### b. Defendant Dr. Hague and Nurse Bass

Next, Plaintiff filed grievance 3740-04-02-0008 on January 21, 2002 complaining that Defendants Dr. Hague and Nurse Bass (now Throckmorton) refused to document a need for smoke-free housing. Defendant Dr. Hague filed a separate Motion for Summary Judgment (Document No. 143.) It appears that Plaintiff may have exhausted the grievance process with respect to Dr. Hague and DOC Defendant Nurse Bass. However, Plaintiff has not stated an Eighth Amendment deliberate indifference claim as to these Defendants.

Plaintiff claims that Dr. Hague's examination of him on January 8, 2002 consisted of Dr. Hague flashing the light of an otoscope quickly across the bridge of his nose and telling his he was alright. Plaintiff also contends that Dr. Hague asked Plaintiff whether he had filed a complaint with the State Medical Board against him. With respect to Nurse Bass, Plaintiff alleges that Nurse Bass was present during his exchange with Dr. Hague. After hearing of Plaintiff's reactions to ETS, Defendant Bass simply responded that "everybody has the same reactions to tobacco smoke." When Plaintiff "refused to accept her erroneous explications" an argument ensued and Defendant Bass had Plaintiff removed. Plaintiff contends that on February 5, 2002, he was seen by Defendant Bass for sinus problems and other reactions caused by his aversion to ETS. Defendant Bass refused to discuss Plaintiff's aversion to ETS, and would not refer Plaintiff to a respiratory specialist.

Talking these sparse allegations as true, they fail to make out a claim for relief. The Court has set forth the law with respect to an Eighth Amendment deliberate indifference claim in the section on Dr. Lightsey above and will not do so again here. However, applying that same law to Plaintiff claims against Dr. Hague, it is clear that Plaintiff's claim must fail. Here, Plaintiff complains that Dr. Hague and Nurse Bass were deliberately indifferent to his serious medical need because Dr. Hague

did not perform a complete examination and he did not order that Plaintiff's housing be changed to a smoke-free environment. Additionally, Plaintiff alleges that Nurse Bass was deliberately indifferent because she failed to refer Plaintiff to a respiratory specialist. Plaintiff's allegations amount to a disagreement with his doctor and nurse regarding his medical treatment or, at most, negligence. Neither of which are actionable in the context of a § 1983 suit. Disagreements over the quality and extent of medical care do not state a claim for relief for deliberate indifference. Estell, 492 U.S. 97 (1976). Following Estelle, the Fourth Circuit expressly held that "[d]isagreements between an inmate and a physician over the inmates's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1984). To be actionable, an inmate's treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). Additionally, simple negligence is not a constitutional deprivation. Daniels v. Williams, 474 U.S. 327 (1986); Estelle v. Gamble, 429 U.S. 97, 105-106 (1976).

Plaintiff has simply not alleged any facts which establish that Dr. Hague or Nurse Bass engaged in any conduct which was deliberately indifferent or constitutionally inadequate. Therefore, Dr. Hague and Nurse Bass are dismissed. Dr. Hague's Motion to Dismiss for Failure to State a Claim for Relief is Granted.

### c. Defendant Daniels, Jordon and Battle

Plaintiff claims that Defendants Daniels, Jordon and Battle conspired to falsely charge and convict Plaintiff for defending his right to due process. The only grievance filed by Plaintiff that could be considered to relate to this issue is grievance 3740-03-03-0028 filed January 28, 2003. However, this grievance does not complain of conspiracy and it was not submitted prior to Plaintiff filing the

instant action.[36] The PLRA requires exhaustion prior to the filing of a lawsuit. Since Plaintiff cannot satisfy the requirements of the PLRA, this claim must be dismissed. Furthermore, even if this claim were exhausted, Plaintiff could not make the showing for this claim. Conclusory allegations of conspiracy, unsupported by a factual showing of participation in a join plan of action, will not sustain a section 1985 claim. Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995).

### d. Defendant Daniels

In his Second Amended Complaint, filed on November 12, 2002, Plaintiff contends that Defendant Daniels attempted to abridge his right of access to the courts. Plaintiff filed grievance 3740-03-03-0028 on January 21, 2003 complaining that legal materials that he ordered were rejected. Even if this Court were to construe grievance 3740-03-03-0028 as an attempt to exhaust his access to court claims, the grievance was filed well after the SAC. Since the PLRA requires exhaustion prior to the filing of a complaint, Plaintiff's access to courts claim must be dismissed.

### e. Retaliation Claim at Pasquotank

Plaintiff claims that he was subjected to retaliatory discipline because he complained about ETS exposure. The record shows that Plaintiff was punished by confinement in disciplinary segregation at Pasquotank for one disciplinary conviction of forgery. Plaintiff appealed his conviction and on January 21, 2003 submitted a grievance complaining of retaliation. However, Plaintiff failed to claim retaliation for complaining about ETS. Instead, the grievance he filed was for retaliation for complaining about the rejection of legal materials. There is no evidence in the record before the Court that Plaintiff filed a grievance regarding retaliatory discipline due to Plaintiff's filing ETS

---

[36] The grievance is dated January 23, 2003 and Plaintiff filed the SAC on November 12, 2002 (Document No. 8.)

grievances. Because the PLRA requires mandatory exhaustion and there is no evidence that Plaintiff exhausted this claim, Plaintiff's retaliation claim due to filing ETS grievances must be dismissed.

### 8. Defendant Hall

Defendant Hall has been working at Hartnett Correctional Institution continuously since 1995 and Plaintiff was last imprisoned at Hartnett in 1995. In September 2000 Defendant Hall wrote to Plaintiff and now believes he wrote in response to a request from Plaintiff to be transferred to Hartnett (Hall Aff. Ex. A and ¶¶ 7-8.) Although it is not clear exactly what Plaintiff's claim is with respect to Defendant Hall, the Court construes Plaintiff's claim to be failure to transfer him to Hartnett.

The Court first notes that Plaintiff cannot satisfy the PLRA's mandatory exhaustion requirement because the record does not include any grievances filed against Defendant Hall. Next, even if Plaintiff could satisfy the PLRA's exhaustion requirement, established law provides that a prisoner lacks any right to be imprisoned in a particular prison facility. See O'Bar v. Pinion, 953 F.2d 74, 84 (4th Cir. 1991). Finally, the record establishes that Defendant Hall lacked authority to transfer Plaintiff or to prevent his transfer to Hartnett (Hall ¶¶ 4, 11.) For all of these reasons, Defendant Hall is dismissed.

### B. Deliberate Indifference

While the Court has concluded that all or most of the Defendants to this action should be dismissed for failure to satisfy the PLRA's mandatory exhaustion requirement, this Court will also analyze the merits of Plaintiff's ETS claim out of an abundance of caution and for the sake of completeness.

All of Plaintiff's deliberate indifference claims rest on his aversion to smoking. Plaintiff claims both that prison officials have been deliberately indifferent to his serious medical condition,

and that they have been deliberately indifferent to a risk of possible future harm.

This Court first notes that there is no constitutional right to a smoke-free stay in prison (*see* Helling v. McKinney, 509 U.S. 25, 29 (2003). The Eighth Amendment does protect inmates from exposure to ETS, but only where conditions of confinement related to smoking evince a deliberate indifference to a serious medical condition or a risk of serious future harm (*see* Estelle v. Gamble, 429 U.S. 97, and Helling).

### 1. Objective Standard

The "deliberate indifference" test has both objective and subjective elements. Objectively, the plaintiff must show "that he himself is being exposed to unreasonably high levels of ETS." Helling at 35. Plaintiff must also show that this exposure has placed his health at risk. To show deliberate indifference to a serious medical condition, Plaintiff must be able to establish the existence of such a condition. To show deliberate indifference to a risk of future harm, Plaintiff must show that his exposure to ETS constituted an unreasonable risk to his health. Helling at 31. The Plaintiff must show that the "deprivation suffered or injury inflicted on the inmate was sufficiently serious." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). The Helling test requires that the levels of ETS be such that they "[violate] current standards of decency to expose *anyone* unwillingly to such a risk." Helling at 36.

Helling suggests various factors for determining whether a Plaintiff's ETS claim will pass the objective element. A Court will consider whether the institution has a formal policy in place, its designation of smoking areas, whether the amount of smoke violates current standards of decency, and prison officials' overall attitude toward the needs of non-smokers. Helling at 36.

### a. Objective Element 1: Levels of ETS

Plaintiff has failed to allege facts sufficient to support an inference that he has been subjected to levels of ETS that meet the "objectively unreasonable" standard of <u>Helling</u>. Plaintiff has also failed to allege facts sufficient to support an inference that he suffers from a serious medical condition which may be aggravated by ETS, or that exposure to ETS during his confinement has unreasonably risked his health.

Plaintiff claims that he suffers from "asthma, rhinitis, **and** (sic) sinusitis ... the only allergies [Plaintiff] has, are penicillin, smoke (especially ETS, incense, and burning perfumed oils), and high concentrate perfumes–including perfumed oils–all are unnatural air pollutants/contaminants," and Plaintiff claims to have a "hypersensitive olfactory sense" (Plaintiff's Supplemental Response at. 38). Plaintiff also claims a "chronic aversion to ... chemical agents, including ... air freshener" and "the smell of unlighted cigarette and pipe tobacco," and to "burning wood," "dry heat," and "air conditioning." (Complaint para. 160, Plaintiff's exhibits 39, 76, 40).

Plaintiff's "hypersensitive olfactory sense" is itself sufficient to call into question the "objectively unreasonable" levels of ETS of which Plaintiff complains. Similarly, Plaintiff's "aversion" to an array of "air pollutants" in whatever quantity militates against a finding that Plaintiff was subjected to levels of ETS that "violate current standards of decency."

Plaintiff's complaint recounts hundreds of incidents of smoking, but the unique nature of Plaintiff's "aversion," which encompasses much more than just ETS and which he claims responds to even low levels of air circulants, requires one to view any possible medical condition as extremely idiosyncratic in nature. For example, Plaintiff contends that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment when a prison guard allowed an inmate to fix his radio with matches (Compl.¶ 84.) Plaintiff also claims a violation of his constitutional rights in

"being forced during meals to sit at tables with inmates saturated with ... perfumes (oils) and thus unable to eat." (Plaintiff's Exhibit 55, Grievance 3740-03-03 0167). Further, at Franklin Correctional Institution Plaintiff was housed in the non-smoking dorm for the entirety of his term there (except during processing). Plaintiff does not allege that smoking ever occurred inside this dorm, but only that smoke from the hallway wafted in through the door or the fans. (Compl. ¶¶ 2-16.)

These episodes are typical of many of Plaintiff's allegations, and taken together, these facts cannot lead to an inference of objectively unreasonable levels of ETS for the simple reason that Plaintiff is not in a position to speak objectively on the matter. In <u>Helling</u>, an inmate was confined to close quarters with a 5-pack a day smoker; Plaintiff's complaint does not even enter the same universe of "unreasonable." <u>Helling</u>, at 28. Plaintiff rather relies on repeated claims that smoking occurs in prisons, and that his peculiar reactions to smoking and Defendants' knowledge of those reactions make housing him in the vicinity of smoking (no matter how much or how little) a violation of the Eighth Amendment. Thus Plaintiff cannot show that he was subjected to levels of ETS exposure "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." <u>Helling</u>, at 35-36. Plaintiff has failed to allege facts sufficient to draw an inference of objectively unreasonable levels of ETS. Applying <u>Helling</u>, Plaintiff has failed to allege facts that could lead to an inference of an objectively high level of ETS.

Since Plaintiff finds constitutional violations in exposures that are clearly not *objectively* unreasonable, it becomes that much more important for Plaintiff to show 1) a well-documented, serious medical condition responsive to or resulting from exposure to ETS, and 2) that prison officials actually knew of this condition and were deliberately indifferent to it.

**b. Objective Element 2: Serious Medical Condition**

Plaintiff has failed to allege facts sufficient to draw an inference that he has a serious medical condition related to ETS, or that his future health has been risked by exposure to ETS in prisons. Plaintiff has made hundreds of sick calls over the years, and has self-reported "aversion" to ETS as causing various health problems. Plaintiff has submitted over fifty exhibits documenting sick call visits, and numerous sheets from his medical record. However, despite numerous appointments with nurses and doctors, Plaintiff has never been diagnosed with or treated for a condition which would support a finding that to subject him to ETS exposure would violate the Constitution. In fact, of all of these visits, this Court notes only three instances in which medical personnel acknowledged ETS as an "irritant" or "allergen" to Plaintiff. However, in none of these three instances did medical staff order Plaintiff to be placed in smoke-free housing. (Compl.¶¶ 57, 28, and exhibit 32). All of this is true despite Plaintiff's repeated claims of ETS reactions, in many different institutions over a period of years.

Plaintiff's visits to Defendants Dr. Glenn Williams and Dr. Chanson de Vaul are instructive. Plaintiff "completed ten Sick Call Requests at ECI between 5/03/01 and 9/14/01. On only one occasion (5/25/01) did he complain of symptoms associated with ETS." (De Vaul Aff ¶ 6.) Dr. Williams and Dr. De Vaul found multiple possible reasons for Plaintiff's symptoms: either Gastro-intestinal reflux disorder, side effects from the high-blood pressure medication Lotensin, reversible airway disease as a result of being a former smoker, hiatial hernia, or tobacco smoke allergies. (Id. at 4-7). After Dr. Williams decided to discontinue Lotensin, Plaintiff showed a marked improvement in his symptoms, although his environment had not changed. (Id. at 7.) Plaintiff has also been affirmatively diagnosed with a "hiatial hernia," which is known to cause coughing at night, when one is in a reclined position, and Plaintiff maintains that his cough is more prevalent at night. (Pl's

Response to Defs.' Mot. for Summ. J. at 12).

Plaintiff claims that "the environmental tobacco smoke complained of is of such an amount as to exacerbate Plaintiff's current physical ailments and to create an overwhelming probability of danger to Plaintiff's future health." (Compl., Prayer for Relief ¶ 16.) However, the record compels the inference that the relationship between ETS and Plaintiff's symptoms has at no time been either certain or serious. The strongest suggestion of a link between ETS and Plaintiff's symptoms was Defendant Dr. De Vaul's assessment of "tobacco smoke allergies" on October 17, 2001.[37] However, neither Defendant Williams nor De Vaul ordered smoke-free housing. Defendant physicians considered Plaintiff's allergies and asthma-related symptoms "mild" and noted that the symptoms "always responded to medical intervention and medication." (De Vaul Aff. at 5). A recommendation was made for smoke-free housing, if possible, but Defendants did not order smoke-free housing because they believed no serious medical condition existed. (Id. at 7).

Plaintiff baldly claims that, working in concert with prison officials, Defendants Doctors Williams, De Vaul, Portner, and Haque "engaged in a widespread collusion to conceal [Plaintiff's] real and apparent 'need' (sic) for smoke-free housing, and to punish [him] for seeking such." (Compl., Prayer for Relief, ¶. 5). This claim is without merit. Over a period of years, Plaintiff has been treated by various doctors, none of whom has ever ordered smoke-free housing for Plaintiff. Plaintiff does not allege any communications between conspirators which would substantiate the existence of an agreement to deny Plaintiff either proper medical attention or appropriate housing. Plaintiff, in support of his claim, simply contends that there is a uniform absence of a diagnosis confirming his

---

[37]However, "there is no medical finding by any physician or other health care provider that Plaintiff is allergic to tobacco smoke or secondhand smoke." (Smith Aff., ¶ 15).

belief in a serious medical condition related to ETS. However, this conformity of opinion among physicians treating the Plaintiff more likely suggests either that the Plaintiff's condition is not very serious or not related to ETS. It would be unreasonable to assume that this conformity is the result of "widespread collusion," especially where no support has been offered for such a claim.

Plaintiff claims that accountability for appropriate medical care within Correctional Institutions is constantly shifted through a bifurcation of responsibility, diffusing blame. (See Plaintiff's Response to Defs.' Mot. for Summ. Judgement at 30-31). This "catch-22" occurs, Plaintiff contends, because Medical personnel hold Custody responsible for assigning housing, while Custody will not assign smoke-free housing without an unambiguous mandate from Medical, which Plaintiff argues Medical is unwilling to give. (Compl, Prayer for Relief ¶ 15, and Response to Defs.' Mot. for Summ. J. at 11-12).

While Medical personnel have repeated that they believe housing assignments to be the responsibility of Custody staff, this is the ineluctable result of their finding that Plaintiff does not suffer from a condition warranting concern. (See Affidavits of Williams, De Vaul, Lightsey, Smith and Portner). Had Medical personnel found a condition requiring Plaintiff's removal from an environment posing a threat to his health, Custody would have had the responsibility of removing Plaintiff from this environment.[38] That Medical did not find a condition does not suggest that they should have, or that they had a responsibility to create one.

Plaintiff has not alleged facts that support a finding that he has been denied appropriate

---

[38]  Custody staff at each institution were very aware of the gravity of denying an inmate proper medical care, or refusing an order from housing from Medical. Consider Defendant Sharpe's statement: "A claim that custody staff has ignored a physician's order for housing of an inmate is a serious claim." (Sharpe Aff. P. 4).

medical care or that his doctors have been negligent, only that they have not found a condition he believes they should have. Thus Custody, in relying on the fact that Medical made no diagnosis requiring special housing, did not breach a duty to Plaintiff. Had Plaintiff been diagnosed with a condition, Custody's failure or refusal to accommodate Plaintiff would have presented a genuine issue of fact. However, with no indication of a condition related to ETS, this "catch-22" is irrelevant.

Finally, this Court considers the DC-490 (Medical Notification Slip) issued to Plaintiff by Nurse Boone at Franklin Correctional Institution. (Compl.¶ 4, and Plaintiff's Exhibit 31; see also Resp. to Defs.' Mot. for Summ. J. at 11-12). Plaintiff received the slip, signed by Nurse Boone, and indicating "Smokeless Dorm," with a checkmark, on November 4, 1999. (Pl's Ex.31.) Plaintiff mentioned the MNS in grievances to prison officials and in support of his requests for smoke-free housing while at Franklin. However, this MNS seems to have been unknown to Medical staff. Plaintiff did not mention its existence to Defendant Dr. Lightsey, treating physician to Plaintiff during his term at Franklin.

In fact, Plaintiff was seen by Dr. Lightsey seventeen times during his term at FCI, and of these sick call visits mentioned ETS only once, in his sick call request preceding the visit of October 17, 2000.[39] (Affidavit of Dr. Lightsey, 3-5). However, it does not appear from the record that Plaintiff informed Dr. Lightsey of the slip's existence, and the MNS was never included in Plaintiff's medical record.

As Dr. Paula Smith has noted, it is odd that Plaintiff obtained an order for smoke-free housing from a nurse, when after repeated and continuous visits with physicians he was never recognized as

---

[39] 12/23/99, 01/19/00, 01/27/00, 02/08/00, 02/17/00, 03/09/00, 03/23/00, 04/11/00, 06/01/00, 06/13/00, 07/20/00, 08/15/00, 09/05/00, 09/12/00, 10/10/00, 10/17/00, and 10/19/00.

needing any special treatment in regard to housing. (Smith Affidavit). Despite numerous records of sick call visits, no record exists reflecting the issuance of the medical notification slip. As a result of the MNS's mysterious appearance and its absence from Plaintiff's medical records, its influence must be confined to what it imported to Custody at Franklin, the only Defendants to have been told of it. As noted above, with the exception of one day custody at Franklin, Plaintiff was in the non-smoking dorm during the entirety of his stay at Franklin.

Plaintiff has failed to allege facts sufficient to support a finding that he suffers from a medical condition that is either serious or directly related to ETS. Plaintiff has also failed to allege facts that would support an inference that his future health has been jeopardized by his exposure to ETS. The Plaintiff's own exhibits, his voluminous sick call catalog, and his medical record, do not support these inferences. In addition, there is a consensus among all of those medical personnel to have treated Plaintiff among various institutions that ETS has not caused or aggravated an existing condition, nor has it increased unacceptable risks to his health. Plaintiff's failure on the objective element entitles Defendants to summary judgment on claims of deliberate indifference to a serious medical condition or risk of harm to future health.

### c. Objective Element 3: Helling Factors

Under <u>Helling</u>, this Court will also consider other objective factors. One important factor is the existence of a formal smoking policy, designating smoking and non-smoking areas within the prison. <u>Helling</u> at 36. Plaintiff concedes that each institution in which he was housed had a formal smoking policy in place, designating smoking and no-smoking areas, and has included those policies with his exhibits. He alleges, rather, that the disregard for the policy at each prison was so uniform as to make these policies non-existent. However, "nothing so amorphous as 'overall conditions' can

rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." Wilson v. Seiter, 501 U.S. 294, 305 (1991).

Plaintiff has failed to show either a serious medical condition or that his health has been placed in jeopardy, or even objectively high levels of ETS. He cannot then prevail on allegations that a smoking policy is imperfectly enforced, because this does not implicate the deprivation of a "single human need." Much of Plaintiff's complaint is dedicated to cataloging the failures of officials to write up or otherwise discipline every occurrence of an inmate smoking. This points to overall conditions that are less than ideal, but one cannot show that this is a constitutional violation unless these conditions actually pass "the threshold test of serious deprivation." Id. Passing this threshold with respect to claims of injury from ETS would require Plaintiff to have more than bare, conclusory assertions of symptoms and discomfort. Instead, he would have to be able to show either a serious medical condition or a risk of future harm. Because Plaintiff cannot meet the second objective element, as this Court has detailed above, he cannot sustain his claim on the theory that smoking policies were not enforced.

## 2. Subjective Element

To sustain a claim under the Eighth Amendment for cruel and unusual punishment, Plaintiff must allege facts sufficient to draw the inference that Defendants acted with deliberate indifference, a state of mind more culpable than negligence. See Wilson. Deliberate indifference may be either "wanton infliction of unnecessary pain" or the complete disregard for the known suffering of an individual. Estelle v. Gamble, 429 U.S. 97, 104 and 103 (1976). This subjective component requires that the prison official have actual knowledge or reckless disregard with respect to the medical condition or substantial risk of future harm to the inmate see Rish v. Johnson, 131 F.3d 1092 (4th Cir.

1997).

Plaintiff's conduct over the course of his tenures at various institutions makes it difficult to find that prison officials have been deliberately indifferent to his needs. From an official's point of view, it may have been difficult to take Plaintiff's complaints about ETS seriously when he made almost daily complaints about a variety of things, most having nothing to do with ETS. In addition, these complaints ranged in tone from plaintive to derisive, insulting, threatening, and/or irrational.[40] Because deliberate indifference requires a state of mind more culpable than disbelief, a finding that prison officials were deliberately indifferent to Plaintiff is difficult given his history of manipulative behavior. For example, in a grievance at Franklin Plaintiff wrote: "This is the second grievance I have written regarding this 'deliberate indifference' (sic) to my serious medical problem and I assure you that you can get an opportunity to explain such indifference to a judge." (Plaintiff's ex. 43, grievance number 4215-00-0457). Similarly, despite having an urgent and "serious medical problem," Plaintiff at the time of his filing had missed 19 medical and/or sick call appointments. Plaintiff has also threatened "lawsuits for inadequate medication when in fact he did not pick up his

---

[40] Consider, for example, a grievance (Plaintiff's ex. 51) submitted on September 30, 2002, while at Pasquotank. Plaintiff intends this exhibit to buttress his claim that officials at Pasquotank were deliberately indifferent to his tobacco aversion. It reads:

"There is no air circulation in the block. I reported this to S. Jernigan, the floor guard. She got fly at the mouth, per her trademark and told me to get back in my block. Two sergeants –Riddick and another–were in the office, laughing and jiving. Jernigan refused to let me see them, charging at me as if she was going to attack me (This type of action is unwise and should be avoided hereafter, at all costs). Banks, in the Control Booth, then refused to let me get or to give me a grievance form. The attitudes of the "all-female" staff is incredible and appalling."

When asked what remedy would resolve his grievance, Plaintiff wrote: "Break up this 'all-female' clique and do something about their 'man-hating' attitudes, right away."

medication from the medication window." (Smith Aff. ¶ 17.)  Plaintiff has also filed complaints and grievances demanding things such as an extra blanket, a pillow wedge, shower brush, eyedrops, toothpaste for sensitive gums, velcro-strapped tennis shoes, and dental floss with dental floss holder. (Id. ¶¶ 4, 18.)  Plaintiff filed a grievance at Albemarle requesting thermal underwear, which he stated was a "medical emergency."  (Hamlin Aff. ¶ 3.)  Plaintiff, although suffering from a severe back injury making him incapable of work, was seen "on the yard dancing around and twisting in front of a group of inmates." (Smith Aff. P. 7).  In response, Dr. Portner noted that Plaintiff "seemed to have a good range of motion." (Id. 8).

Similarly, Plaintiff has refused to complete or participate in educational programs and turned down requests for SOAR program consideration, instead "[occupying his] time by filing grievances and writing letters to everybody from the Governor on down."  (Joseph Hall, explaining denial of Plaintiff's request for transfer to lower-level facility at Plaintiff's ex. 79).  In addition, "during the twelve and one-half months when he was confined at Franklin, Plaintiff submitted approximately fifteen grievances ... [complaining] about such things as the arrangement of beds in his dormitory, late delivery of Christmas packages, preferential treatment allegedly given to white inmates, removal of a flyswatter, mail procedures, and medical care." (Townes Aff. ¶ 5).  He has also been found guilty of several disciplinary infractions, ranging from disobedience and profanity to weapon possession, which he continually alleges are "fictitious" or are evidence of prison officials' evil motives towards him.

It is not difficult to see why Defendants did not take Plaintiff's complaints regarding ETS as seriously as he thinks they should have.  The sheer number of complaints, on a variety of subjects, undermine Plaintiff's credibility as to the seriousness of any of them.  In addition, Plaintiff has never

been diagnosed with a medical condition related to ETS, and thus Defendants were left solely with Plaintiff's complaints of discomfort. Given Plaintiff's attitudes and constant complaining against prison officials, the burden of showing that Defendants *actually* knew that he had a serious medical condition aggravated by ETS is all the more important.

Much of Plaintiff's Complaint focuses on his use of the administrative remedy scheme in addressing his problem with ETS. Plaintiff alleges that the failure of the grievance process to secure him a living environment in which he would have zero contact with secondhand smoke amounts to deliberate indifference. This is simply not the standard. Plaintiff has filed many grievances, but the fact that prison officials reviewing the grievances did not decide to resolve them in Plaintiff's favor is not relevant in itself to establish deliberate indifference. So long as prison officials did not wantonly inflict pain, deprive Plaintiff of a single human need, or evince a knowing disregard for his health, or otherwise violate the Constitution, their policies and procedures in regard to complaint resolution are not this Court's concern.

Plaintiff has not stated an ETS claim based on deliberate indifference to his serious medical condition or to a risk of possible future harm against any of the named Defendants pursuant to the standard forth in <u>Helling v. McKinney</u>, 509 U.S. 25 (1993 ) and as analyzed above. For this reason, and because Plaintiff has failed to exhaust most, if not all of his claims, Plaintiff's Complaint is DISMISSED.

## V. ORDER

**THEREFORE, IT IS HEREBY ORDERED** that:

1. Defendant Dr. Hague's Motion to Dismiss (Document No. 143) is GRANTED

2. Defendants Lightsey, DeVaul and Williams' Motion for Summary Judgment (Document No. 199)

is GRANTED

3. DOC Defendants Motion for Summary Judgment (Document No. 204) is GRANTED

4. Plaintiff's Motion to Compel Discovery (Document No. 188), Plaintiff's Motions for Extension of Time to Conclude Discovery (Document Numbers 190, 195), Defendants' Motion for A Protective Order (Document No. 193) and Plaintiff's Motion for Miscellaneous Relief (Document No. 228) are dismissed as moot.

5. This Order is dispositive of Plaintiff's case and therefore Plaintiff's case should now be closed.

**SO ORDERED**.

Signed: February 13, 2007

Graham C. Mullen
United States District Judge